**NORWITT v. UNITED STATES.**
No. 12909.

United States Court of Appeals
Ninth Circuit.

March 12, 1952.

Rehearing Denied April 14, 1952.

no

Leo R. Friedman, San Francisco, Cal., for appellant.

Chauncey Tramutolo, U. S. Atty., Robert B. McMillan, Asst. U. S. Atty., Walter M. Campbell, Jr., Regional Counsel, Penal Div., Bureau of Internal Revenue, Clyde R. Maxwell, Jr., Trial Attorney, Penal Div., Bureau of Internal Revenue, all of San Francisco, Cal., for appellee.

Before DENMAN, Chief Judge, ORR, Circuit Judge, and LEMMON, District Judge.

LEMMON, District Judge.

Challenging the sufficiency of the evidence to support the verdict of guilty on each of three counts of an indictment charging attempts to evade and defeat income taxes, the appellant brings his case to this court.

### 1. Statement of the Case.

Each count charges that a false and fraudulent return was filed by the appellant on June 23, 1945.

Count 1 alleges that in a return for the fiscal year ending July 31, 1941, the appellant, who was the president of the General Refrigerator Corporation, averred that the net income of the corporation for that period was $317.05 and that the total amount of the tax due thereon was $47.08, whereas, as he well knew, the company's net income "for the said calendar (sic) year" was $9,905.68, and the total tax due thereon was $2,990.24.

Count 2 recites that the appellant filed a joint income tax return on behalf of himself and his wife, stating that their net

income for the calendar year 1942 was $11,540.74 and that the tax due thereon was $2,731.48, whereas their joint net income for that calendar year was $30,808.76, upon which an income tax of $12,744.37 was due.

Count 3 sets forth that the appellant filed a joint income and victory tax return for the calendar year 1943, on behalf of himself and his wife, asserting that their net income for that year was $28,081.04 and that the tax due thereon was $11,760.88, whereas their joint net income for that year was $46,805.43, upon which there was due an income and victory tax of $24,010.50.

In each count, the required scienter was alleged.

After a jury trial, the appellant was convicted on each of the three counts, and was sentenced to a year's imprisonment on each count, the sentences to run concurrently, and to pay a fine of $10,000, and costs.

## 2. Statement of Facts.

From 1937 to 1941, the appellant was president of the General Refrigerator Corporation, with offices in San Francisco. After July 31, 1941, he personally acquired the assets and all the capital stock of the corporation, and conducted the business as a sole proprietorship, although the corporation continued in existence. Until December 30, 1944, Marco Norwitt was vice president and Barney Norwitt was secretary-treasurer of the company. On that date all three officers resigned, the corporation's capital stock having been theretofore transferred to The Mission Company. On that some date, the attorney for the Refrigerator Corporation was directed to turn over all records and documents of the corporation to the attorney for The Mission Company.

The tax return of the Refrigerator Corporation, which forms the basis of Count 1, was filed, in the language of counsel for the appellant, "under most peculiar and mysterious circumstances". The return had been prepared in 1941 by William McIntosh, a public accountant, engaged for that purpose by the Refrigerator Corporation. The return bears the signature of McIntosh, who testified as to the appellant's signature as follows: "I see a faint recollection of him signing. * * The way it seems to me, as I recall, he was standing and he took it (the return) to a desk and sat down and signed it." This occurred in 1941.

There is no question, however, that the corporate return was signed by the appellant as president and by Marco Norwitt, the appellant's brother as vice president.

McIntosh "executed the signature as the person who prepared the return and turned it over to" the appellant. Adolph Washauer, division chief of the office of the Collector of Internal Revenue at San Francisco, testified that at a meeting in the early part of May, 1945, with Arthur P. Shapro, at that time the appellant's attorney, Shapro showed him the 1941 corporate return and said, "Well, we forgot to file". Shapro turned over this corporate return to Washauer, according to the latter. Later, Nathan Spivock, the appellant's accountant, asked the Collector's representatives to let him have the return "so it would be of some assistance to him", and they complied with his request. Spivock later gave the return back to the revenue men.

The corporate return was filed on June 23, 1945, but the jurat to the signatures of the proper officers was dated June 25, 1945. On cross-examination, Washauer testified that the return was given to him by Shapro *for filing*. Shapro, however, denied that the return was ever in his possession. It was the jury's function to resolve this conflict in the testimony.

The appellant seeks to make much of the fact that Washauer later testified that Shapro gave him the return "as a matter of record" or "as part of the records that he had". But, as we have seen, the fact remains that both the appellant and his brother swore to the return after it was filed. The appellant himself, in his brief, declares: "The evidence further establishes that this return was not filed until June 23, 1945, and the jurat to the signatures of the alleged president and vice president of the corporation is dated June 25, 1945".

On April 15, 1943, the appellant and his wife filed their joint income tax return for the year 1942, and on June 23, 1945, they filed their amended return for 1942, together with delinquent returns for 1939, 1940 and 1941.

On March 15, 1944, the appellant and his wife filed their joint return for 1943, and on June 23, 1945, they filed their amended return for 1943.

Counts 2 and 3 of the indictment are based upon the amended returns for the respective years named therein. Although the indictment does not use the word "amended", the filing date alleged therein makes it clear that these two counts relate to the amended returns for 1942 and 1943. The appellant concedes that "the two original individual tax returns filed in 1943 and 1944 by Paul and Freda Norwitt were inaccurate and understated the taxable income," but points out that he was not on trial for having filed those returns.

Some time before March 15, 1945, the appellant employed Spivock to prepare the 1944 income tax returns for the appellant and his wife. Harry J. Stephenson, an employee of Spivock's, handled most of the details. In the course of his work, Stephenson learned that rental income had been omitted from the appellant's returns for 1942 and 1943, and he recommended the preparation of amended returns for those years. At about the same time, Stephenson also prepared the appellant's original individual returns for 1939, 1940 and 1941.

Stephenson learned from the appellant that the latter had been engaged in a business known as the General Refrigerator Corporation. When the accountant asked for the records of that business, the appellant told him that they "had been burned in a fire".

Early in 1945, Washauer commenced an investigation of the appellant's income tax liability and that of the General Refrigerator Corporation. In the early part of February, 1945, Washauer and Ralphe Mohr, his assistant, visited the offices of the company, looking for the appellant, but they were informed that he "had already sold his place", and that others had taken over the business about the first of that year. The internal revenue men were shown five or six books lying on a table, which were described as belonging to the old company. The officers did not take them because the appellant was not present.

In the latter part of April, 1945, the same two officers called on the appellant at his place of business, at that time known as the National Liquor Store. The appellant told them that all his records, referring to the refrigerator company's as well as his own, "were burned in two fires". Washauer was "positive" that the appellant had stated that "all" the records had been burned.

At about the same time, Spivock called at the Collector's office in San Francisco. Present at that meeting were Washauer, Mohr and Gustave C. Roder, a deputy clerk in that office. On his first visit, Spivock was asked to present himself with proper credentials. A few days later, armed with a power of attorney, Spivock returned and stated that the appellant had told him that all records had been burned and he would have to "work out" on a net worth basis the financial statement that the Collector's office had asked the appellant to fill out.

Stephenson overheard a conversation between the appellant and Spivock, in which the latter carefully explained to the appellant that the accountants should have "all the information" in arriving at the "ending net worth", as of December 31, 1944. From that information, Stephenson prepared the amended returns for 1942 and 1943. Each of these amended returns contained the following statement: "It is not possible to obtain exact figures or details because the taxpayer's records were destroyed by fire in 1943."

These representations that all the appellant's records had been destroyed by fire were false. As we have seen, early in February, 1945, Washauer and Mohr were shown some of the refrigerator company's books, which they did not, however, examine, because the appellant was not present. In November, 1945, Thomas W.

Cleary, special agent of the Bureau's Intelligence Unit, visited the offices of the "reactivated" corporation, and "noticed quite a pile of records, canceled checks, sales invoices". Several days later, accompanied by William F. Bobadilla, a Deputy Collector of Internal Revenue, Robert Farrell and Mohr, Cleary again visited the company's offices. This time the officers were informed by R. W. Pfeiffer, the manager and vice president of the new company, that "They had called Mr. Norwitt on it several times, but he hadn't come out to pick them up." Besides the items already mentioned, this pile of papers included "correspondence, purchase invoices and probably a few balance sheets, accountants' balance sheets". On this second visit, Cleary picked up the records and took them to his office.

In March, 1946, Cleary found four small cardboard boxes containing sales invoices in a bungalow at 32 Crescent Avenue, San Francisco, where the appellant had resided. Cleary found that "a great number" of these sales invoices had been "left off" of the sales register—"were not posted at all". Cleary wrote to the appellant to bring in "the rest of his books", and the latter did so in October, 1947. This same officer also obtained some "books of the business" from the State Board of Equalization, which had been making an investigation.

Indeed, not only did the officers find sales tags that were not posted to the sales register during the three taxable years involved herein—1941, 1942, and 1943—but they also unearthed sales for which there were neither sales tags nor book recordation.

■ From the foregoing statement of the evidence, it will be seen that there is ample support for the verdict of guilty as to each of the three counts. The appellant, however, attacks the sufficiency of the evidence on several technical grounds, which will be considered seriatim.

3. The Official Status of the Appellant and His Brother at the Time the Corporate Return was Filed Is Immaterial.

The appellant contends, as to Count 1, that at the time the return of the General Refrigerator Corporation for the fiscal year ending July 31, 1941, was filed, neither the appellant nor his brother, who signed the return, was an officer, director, or stockholder of the company, and that therefore such a return could not form the basis for a violation of 26 U.S.C.A. § 145(b), under which the present indictment was brought.

The subsection in question reads as follows:

"145. * * *

"(b) *Failure to collect and pay over tax, or attempt to defeat or evade tax.* Any person required under this chapter to collect, account for, and pay over any tax imposed by this chapter, who willfully fails to collect or truthfully account for and pay over such tax, and *any person* who willfully *attempts in any manner* to evade or *defeat* any tax imposed by this chapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution." (Emphasis supplied.)

The English language could not supply more inclusive and sweeping words than have been employed in the foregoing section: "any person" is prohibited from "attempting" "in any manner" to "defeat" the tax.

The point was lucidly expounded in Spies v. United States, 1943, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418: "Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation. Nor would we by definition constrict the scope of the Congressional provision that it may be accomplished 'in any manner'. By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up

sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal." [1]

■ Furthermore, as we have seen, the appellant on July 31, 1941, became the transferee of all the assets and capital stock of the corporation, and therefore was liable for any prior income tax liability of the latter. See 26 U.S.C.A. § 311(a)(1).

■ There is substantial evidence that the corporate return for 1941 was signed and sworn to by the appellant and was filed at the instance of his attorney; that it was false; and that the appellant intended it to be false. These factors make out a violation of the statute.

4. The Appellee Did Not Rely Upon The Net Worth Method In Establishing That The Amended Returns for 1942 and 1943 Were False.

In both of his briefs, the appellant relies chiefly upon the testimony of Bobadilla as demonstrating that the appellee selected the net worth method as at least one of the means of establishing the appellant's guilt. The appellant then proceeds to find fault with the way in which the net worth method was applied in the instant case.

■ The testimony of Bobadilla, however, categorically refutes the appellant's contention that the appellee relied upon the net worth method. Over the vigorous objections of counsel for the appellant, the former Deputy Collector of Internal Revenue testified as follows:

"Q. Now, Mr. Bobadilla, did you undertake to compute Mr. Norwitt's income on the net worth basis? A. No, I did not.

"Q. And why did you not do so? A. When I first—(Objection by counsel for the appellant; overruled.)

"A. When I first started in on the case, I was, I made various—to start off with, I had no records—(Objection by counsel for the appellant; overruled.)

"A. (Continuing): In view of the missing records, I thought it would be better if I could start work on the net worth basis, so I started on that basis. In the meantime, various records were, the sales tags were sorted and I found out I had almost a complete record of all the sales, so I worked from the basis, on the basis of the understatement of sales of the General Refrigerator Corporation and unreported income for rent and capital gains and bank—

(Motion to strike the answer was made by counsel for the appellant and was denied.)

5. Intent to Evade or Defeat the Tax May Be Inferred From the Acts of the Accused.

The appellant contends there was no competent evidence to establish that either amended return—the one for 1942 or the one for 1943—was filed in a willful attempt to evade or defeat the tax. It is argued that the returns were prepared by a certified public accountant "after successive conferences with representatives of the Internal Revenue Department and were brought to Mr. Norwitt for his signature by a Deputy Collector of Internal Revenue," etc.

■ It is hornbook law that the Government need not adduce direct proof of intent. It may be inferred from the defendant's acts. This principle has been repeatedly applied in income tax cases. [2]

■ Many of the sales invoices were withheld from the bookkeepers and "were not posted at all". Most of the invoices were in the appellant's handwriting. It is reasonable to infer, from all the circum-

1. See also U. S. v. Troy, 1934, 293 U.S. 58, 62, 55 S.Ct. 23, 79 L.Ed. 197; U. S. v. Miro, 2 Cir., 1932, 60 F.2d 58, 61; Tinkoff v. U. S., 7 Cir., 1936, 86 F.2d 868, 876, certiorari denied, 1937, 301 U.S. 689, 57 S.Ct. 795, 81 L.Ed. 1346, rehearing denied, 1937, 301 U.S. 715, 57 S.Ct. 937, 81 L.Ed. 1366.

2. See the excerpt from Spies v. United States, supra; Battjes v. United States, 6 Cir., 1949, 172 F.2d 1, 5; United States v. Rosenblum, 7 Cir., 1949, 176 F.2d 321, 330, certiorari denied, 1949, 338 U.S. 893, 70 S.Ct. 239, 94 L.Ed. 548, rehearing denied, 1950, 338 U.S. 940, 70 S.Ct. 344, 94 L.Ed. 579.

stances of this case, that the appellant knew that not all the sales made during 1942 and 1943 were recorded in his books or were incorporated in his original income tax returns.

Ray S. Rossitter, the bookkeeper who "reconstructed" some of the corporation's fire-damaged records in 1943, testified as follows:

"A. Well, then after computing the cost of goods sold, the sales would show such a terrific deficiency, and I asked Mr. Norwitt if he could lose that amount of money and he went—I went through the files and I found some sales to the Maritime Commission, and then he went down to the Bank of America and he brought me additional sales slips which naturally was of sufficient amount that the business showed a profit for the year instead of a rather substantial loss.

\* \* \* \* \* \*

"Q. Did you have access to any sales invoices for these government sales? A. No.

"Q. Had they previously been recorded in the books? A. No.

"Q. As I understand it, your testimony is that you first learned about them when you questioned Mr. Norwitt, is that correct? A. That is correct.

"Q. And when was that? A. Well, when I was making up the tax returns before March 15th.

"Q. Return for 1943? A. That is correct."

■ The appellee insists, and correctly, that Norwitt was not entitled to rely on the income computed by his accountant when he withheld from him the information whence that income could have been correctly determined. Indeed, the appellant concedes that "the original returns were erroneous and understated both the taxable income and the tax due thereon." That

fact could properly be considered by the jury in connection with the willful falsity of the amended returns.[3]

6. The Filing of Amended Returns May Constitute a Violation of Section 145(b).

Finally, the appellant contends that "the filing of the amended returns (for 1942 and 1943) did not constitute a violation of Section 145(b) of the Internal Revenue Code".

■ We do not agree. The appellant correctly states that "An attempt to evade a tax and the payment thereof is not a continuing offense." His error, however, occurs in the sentence immediately following: "While there may be such a crime in each year for which an income tax is due, once the attempt has been consummated by the filing of a false and fraudulent return in any particular year, the offense has been completed for that year, and nothing done thereafter to carry out the initial unlawful purpose for such year can constitute a new offense".

The sole case cited to support this remarkable proposition is United States v. Johnson, 7 Cir., 123 F.2d 111, 119, reversed on other grounds in United States v. Johnson, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546. That decision, however, is not at all in point. In that case, the first four counts of the indictment charged the same offense except *for different years*. In the light of those facts, the court correctly said that "an attempt to evade income tax is a separate offense for each year." That is a far cry from saying that *several* such separate offenses may not be committed for the same year.

The appellant's argument can be reduced to an absurdity. A man attempts to assassinate the President of the United States on January 1, 1952. He escapes arrest, and tries the same thing the next day. He keeps up this record of poor marksmanship and

3. See Himmelfarb v. United States, 9 Cir., 1949, 175 F.2d 924, 941, certiorari denied, 1949, 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527; Emmich v. United States, 6 Cir., 1924, 298 F. 5, 9, certiorari denied, 1924, 266 U.S. 608, 45 S.Ct. 93, 69 L.Ed. 465; Lisansky v. United States, 4 Cir., 1929, 31 F.2d 846, 851, 67 A.L.R. 67, certiorari denied, 1929, 279 U.S. 873, 49 S.Ct. 514, 73 L.Ed. 1008; Tinkoff v. United States, supra, 86 F.2d at page 879; Malone v. United States, 7 Cir., 1938, 94 F.2d 281, 287, certiorari denied, 1938, 304 U.S. 562, 58 S.Ct. 944, 82 L.Ed. 1529.

swift flight for every one of the 366 days of the year. Is he guilty of but one attempt against the President's life—or of 366?

The analogy with several attempts to evade an income tax for the same year is complete. In the one case, the missed target is the same human being; in the other, the public fisc for the same year.

■ There is ample authority for the proposition that a person may be prosecuted for filing an amended return. In Levy v. United States, 3 Cir., 1921, 271 F. 942, 943, the Court said: "Both in the trial court and in this court Levy insisted that his conviction under either count cannot be sustained, mainly because the offenses which the counts charged relate to an amended return of income and excess profits taxes when, as he urges, no return of that character is known to the law. While amended or corrected income tax returns may not be prescribed by the statute, they are nevertheless allowed and received by the Treasury Department in the administration of the Income Tax Law, and on such returns taxes are assessed by the Commissioner of Internal Revenue. When so assessed, these are the taxes which under the law are charged against and collected from the taxable. That Levy made such a return, by name and in fact, that it contained a material false statement, and that he endeavored thereby to establish his corporation's taxes at less than the correct amount, has been proved by the verdict of the jury." [4]

7. The Scope of Review On Questions of the Insufficiency of the Evidence.

■ It is elementary, of course, that this Court is not concerned with the weight of the evidence.[5] The appellate Court will resolve all reasonable intendments in support of the verdict, even in a criminal case.[6]

■ The proof in a criminal case need not exclude all *possible* doubt. It "need go no further than reach that degree of probability where the general experience of men suggests that it has passed the mark of reasonable doubt." [7]

We conclude that the appellee has sustained its burden on appeal in all these respects.

8. Since the Sentence Imposed, Including the Fine, Did Not Exceed That Which Might Lawfully Have Been Imposed Under Any Single Count, the Judgment Upon the Verdict Must Be Affirmed If the Evidence Sustains the Conviction on Any One Count.

As has already been stated, the appellant was sentenced to one year's imprisonment on each of the three counts of the indictment, the sentences to run concurrently. In addition, the appellant was fined $10,000, without reference to any particular count.

The appellee argues that in cases involving only the sufficiency of the evidence as to individual counts of the indictment charging the same offense for different years, the judgment must be affirmed if identical concurrent sentences have been imposed on the counts as to which the defendant was found guilty, and the evidence is sufficient to sustain any one of the counts.

In support of its position, the appellee cites the cases of Danziger v. United States, 9 Cir., 1947, 161 F.2d 299, certiorari denied, 1947, 332 U.S. 769, 68 S.Ct. 81, 92 L.Ed. 354; Jarvis v. United States, 1 Cir., 1937, 90 F.2d 243, certiorari denied, 1937, 302 U.S. 705, 58 S.Ct. 25, 82 L.Ed. 544; and Cravens v. United States, 8 Cir., 1932, 62 F.2d 261, certiorari denied, 1933, 289 U.S. 733, 53 S.Ct. 594, 77 L.Ed. 1481. Those cases, however, do not involve the problem that here faces us. There was no fine imposed upon Danziger at all, the prison sen-

4. See also United States v. Smith, D.C. La., 1926, 13 F.2d 923, 924.

5. Pasadena Research Laboratories v. United States, 9 Cir., 1948, 169 F.2d 375, 380, certiorari denied, 1948, 335 U.S. 853–854, 69 S.Ct. 83, 93 L.Ed. 401. Cf. United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 254, 60 S.Ct. 811, 84 L.Ed. 1129.

6. Henderson v. United States, 9 Cir., 1944, 143 F.2d 681, 682; Pasadena Research Laboratories v. United States, supra, 169 F.2d at page 380.

7. Henderson v. United States, supra, 143 F.2d at page 682; Pasadena Research Laboratories v. United States, supra, 169 F.2d at pages 379–380.

tences were plainly ascribed to each count, though running concurrently, and the judgment as to the fined corporate appellants was reversed. In the Jarvis case, there were no fines imposed upon any one, and the prison terms were clearly related to each count. In the Cravens opinion, it is shown that the fines were not "open" ones, but were definitely related to specific counts. See 62 F.2d at page 263. In each of these cases, the sentences, whether of fine or imprisonment, were, though concurrent, clearly referable to a certain count.

There are, however, a number of Supreme Court decisions containing language sufficiently broad to support the appellee's position.

In Abrams v. United States, 1919, 250 U.S. 616, 619, 40 S.Ct. 17, 18, 63 L.Ed. 1173, the Court said: "We shall not need to consider the sufficiency, under the rule just stated, of the evidence introduced as to all of the counts of the indictment, for, since the sentence imposed did not exceed that which *might* lawfully have been imposed under any single count, the judgment upon the verdict of the jury must be affirmed if the evidence is sufficient to sustain any one of the counts. (Cases cited)" (Emphasis supplied.) [8]

█ So here, the concurrent sentences of one year on each count and the general fine of $10,000 were within the maximum specified for any one count in 26 U.S.C.A. § 145(b), supra.

### 9. "Men Must Turn Square Corners—"

A devious tale of tax-dodging has been told in this record.

It is a tale of a four-year delay in filing one return, after it had been apparently completely prepared by a public accountant. In his brief, the appellant stresses the "most peculiar and mysterious circumstanc-

es" surrounding the filing of that return, although it is not clear what comfort he hopes to derive from the muddy waters. It was his duty, as head of the company, to see to it that a proper corporate return was filed on time, under circumstances that were neither "peculiar" nor "mysterious".

It is a tale, too, of books of account conveniently tossed aside and abandoned, although the new owners repeatedly demanded of the appellant that he take them away; of one or two fires that the appellant told his own accountant had destroyed "all" his records—though some of them were later produced by the appellant himself, when prodded, or were unearthed by the deputy collectors of internal revenue.

Finally, it is a tale of sales without sales tags, and of sales tags without proper recordation. This lack of sales tags caused one of the appellant's bookkeepers to ask him—somewhat naively perhaps—whether he could lose that amount of money! The appellant, however, quieted his bookkeeper's fears by producing additional sales slips that changed the color of the ink from red to black.

All in all, the appellant seems not to have been guided by the salutary admonition of Mr. Justice Holmes in Rock Island, Arkansas, & Louisiana Railroad Company v. United States, 1920, 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188; "Men must turn square corners when they deal with the Government."

As never before, that admonition needs to be heeded today. See also Ex parte Tsugio Miyazono, 9 Cir., 1931, 53 F.2d 172, 173–174.

There was ample evidence to support the verdict, and the judgment based thereon, as to all three counts.

Affirmed.

---

8. See also Pierce v. United States, 1920, 252 U.S. 239, 252–253, 40 S.Ct. 205, 64 L.Ed. 542; United States v. Trenton Potteries, 1927, 273 U.S. 392, 401–402, 47 S.Ct. 377, 71 L.Ed. 700; Sinclair v. United States, 1929, 279 U.S. 263, 299, 49 S.Ct. 268, 73 L.Ed. 692; Whitfield v. Ohio, 1936, 297 U.S. 431, 438, 56 S. Ct. 532, 80 L.Ed. 778; Barron, Federal Practice and Procedure, Rules Edition, Volume 4, Section 2268, page 279 (1951).