**KOBEY et al. v. UNITED STATES.**
**No. 13257.**

United States Court of Appeals,
Ninth Circuit.

Nov. 30, 1953.

See also D.C., 109 F.Supp. 687.

Cannon & Callister, David H. Cannon, Los Angeles, Cal., Minsky & Garber, Ernest R. Utley, J. B. Beckenstein, Los Angeles, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., Ray H. Kinnison, Asst. U. S. Atty., Chief, Criminal Division, Arline Martin, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before MATHEWS and ORR, Circuit Judges, and LEMMON, District Judge.

LEMMON, District Judge.

"Hair-raising" and "horrendous" are the adjectives used by two of the appellants to denounce the sentences that they are here seeking to overturn.

All four appellants are admitted lawbreakers. Yet now they are loudly invoking a "concept of ethics, social natural justice and fair play"—a concept in which the record shows that they themselves have been conspicuously lacking.

The appellants were bookmakers. Each was convicted on one count of conspiracy to defraud the United States and on eighteen counts of violations of the income and excise tax laws.

All four appellants admit that, in carrying out their illegal practices, they "nicknamed God's creatures",[1] although, as we shall see, they do not agree upon their reasons for doing so.

Another protective device resorted to by the quartet was to counsel their "agents"—i. e., employees—to destroy records and "have no bookmaking paraphernalia around where it could be found".

All in all, the tale told by this 1536-page record and the bales of exhibits is not a pretty one.

1. *The Indictment*

The indictment, filed on June 12, 1951, named 68 defendants, and consisted of 20 counts. The four appellants were the only defendants named in every count. The appellant Harry Kogus was indicted as Harry Rockwell.

Count One, laid under 18 U.S.C.A. §§ 88 (1946 Ed.) and 371, charges that all the defendants and "other persons to the grand jury unknown" conspired to defraud the appellee by impairing, defeating, and obstructing the lawful functions of internal revenue officials in "ascertaining, computing, levying, assessing, and collecting taxes" for the appellee. The conspiracy is alleged to have commenced on or about August 1, 1945, and to have continued until the date of the return of the indictment.

The Count recites that the object— not the overt acts—of the conspiracy was to be accomplished as follows:

By concealing the identities of persons dealing with the defendants in connection with horse race betting and other gambling conducted by the defendants and others; concealing the amounts of money paid by such persons to the defendants and vice versa; concealing the identities and the compensation of the defendants' employees in such activities; destroying records that would indicate such data; and by maintaining records of the said activities that were "false, fictitious, and misleading as to the names used for the defendants and the persons dealing with them and the transactions recorded".

Thirteen overt acts are set out in connection with Count One. Since no question has been raised regarding these items, they need not be set out here.

Similarly, since the 44 defendants charged therein were acquitted on Count Two, which alleged a conspiracy to commit offenses against the appellee by attempting to defeat and evade income and excise taxes and by willfully failing to collect and account for income taxes required to be withheld, that Count will not be summarized.

Counts Three to Ten, inclusive, were brought under 26 U.S.C.A. § 2707(c). Counts Three to Six, inclusive, allege that the four appellants attempted to defeat and evade *income* taxes required to be withheld from wages, by willfully failing to "collect and truthfully account for, and pay over" to the appellee such taxes for the four quarters of 1948.

Counts Seven to Ten, inclusive, charge that the appellants attempted to defeat and evade "a large part" of the *excise* taxes on employers and employees owed to the appellee for the same periods by filing "false and fraudulent" Employer's Tax Returns.

---

1. Hamlet III i 151–152.

Counts Eleven to Twenty, inclusive, allege violations of 26 U.S.C.A. § 145(b). The appellants and another defendant—a different one in each of these last ten counts—are charged with "willfully and knowingly" attempting to "defeat and evade a large part" of the *income* tax due by each said fifth named defendant for the calendar year 1948.

In each of the 18 substantive counts, the indictment specifies the amount of tax that should have been withheld, paid, or reported due, and the sum actually withheld, reported, or paid by the various named defendants. Since the appellants do not attack the mathematical accuracy of these counts but urge their legal insufficiency, the figures need not be set out here.

### 2. *The Verdicts And The Sentences*

Each appellant was found guilty as charged on Count One and on Counts Three to Ten, inclusive, and was found guilty of the lesser offenses of willful failure to supply information for the computation, assessment, and collection of the tax, which lesser offenses are embraced in the offenses charged in Counts Eleven to Twenty, inclusive. The sentence pronounced upon each appellant was as follows:

Imprisonment for five years on Count One and on each of Counts Three to Ten, inclusive, the periods of imprisonment to run concurrently.

Fines of $10,000 on Count One and on each of Counts Three to Ten, inclusive, or a total of $90,000.

Suspension of the imposition of sentence for the lesser offenses included in Counts Eleven to Twenty, inclusive, with five years' probation commencing on the appellant's release from custody following execution of the concurrent sentences under Count One and Counts Three to Ten, inclusive. One of the conditions of probation is that the appellant, during the probationary period, shall pay a fine of $10,000 under each of Counts Eleven to Twenty, inclusive, or a total of $100,-000. This latter figure and the $90,000 on Count One and Counts Three to Ten, inclusive, amount to a grand total of $190,000 that must be paid by each appellant.

### 3. *The Specifications of Errors*

The Kobey brief contains a specification of eight *numbered* errors. "Specification No. 6", however, contains four *lettered* subdivisions, each dealing with the Court's instructions. Of these four subdivisions, two deal with instructions, given or refused, on at least four separate subjects—presumption of innocence, general and specific intent, lack of notification to produce books, and willfulness and good faith. The entire specification of errors covers nine printed pages, and complains of at least fourteen separate and distinct errors.

The Kogus brief has a specification ten pages long, consisting of two *numbered* errors. Error No. 1, however, is broken into *fifteen* subdivisions, each dealing with a separate and distinct instruction, given or refused, usually relating to a separate and distinct subject. In many respects, the Kogus specification and the Kobey specification duplicate each other.

Neither specification conforms to Rule 18(2) (d) of this Court, which requires that an appellant's brief shall contain, in the order there stated—

"In all cases, a specification of errors relied upon which shall be *numbered* and shall set out separately and particularly each error intended to be urged. * * * When the error alleged is to the charge of the court, the specification shall set out the part referred to totidem verbis, whether it be in instructions given or in instructions refused, *together with the grounds of the objections urged at the trial.*" (Emphasis supplied.)

If the use of lettered subdivisions of numbered specified errors was intended to blur the multiplicity of the objections, it has failed of its purpose. This Court has repeatedly declared itself not bound to consider such "package" specifications. In Mutual Life Ins. Co. v. Wells Fargo

Bank & Union Trust Co., 1936, 9 Cir., 86 F.2d 585, 587, we said of a far less objectionable *assignment* of error:

> "Assignment 6 is that the trial court erred in failing and refusing to give the jury six instructions said to have been requested by appellant. This assignment is invalid, in that it attempts to cover six alleged errors, thereby violating our rule 11, which provides 'that an assignment of errors 'shall set out separately and particularly each error asserted and intended to be urged.' (Many cases cited.)" [2]

Furthermore, it should be noted that Specification 6B of the Kobey brief complains that Defendants' Requested Instructions Nos. 33, 37, and 38 were not given, *but no "grounds of the objections urged at the trial" are set out in the specification, as required by Rule 18(2)(d)*, supra. Similarly, Specification No. 1 d, e, f, g, h, i, j, k, l, m of the Kogus brief, relating to Defendants' Requested Instructions Nos. 26, 27, 28, 30, 31, 32, 35, 37, 38, and "—", sets forth in each instance that "objection was seasonably made", citing the transcript of record. Such a reference clearly does not meet the requirement of Rule 18(2)(d), that the grounds of the objections urged at the trial shall be "set out" *in the specification.*

Finally, the record shows that after the Court had instructed the jury and counsel for the appellants had made certain objections and requests, the attorney for the defense added:

> " * * * and I assign as error the failure to give the instructions we have requested on the grounds stated."

■ The cryptic and sweeping phrase, "on the grounds stated", may have referred to some "suggestions" made by counsel for the appellants during a "conference on instructions" or perhaps the "discussion re include (sic) lesser offenses". Both of these running debates commenced on the day preceding the giving of the instructions and continued up to a few minutes before counsel resumed their summations. Immediately afterward, the District Judge delivered his charge.

In our view, such a procedure does not meet the requirement of Rule 30 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., to the effect that "No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, *stating distinctly the matter to which he objects and the grounds of his objection.*" [3] Reliance upon "the grounds stated" if any grounds *were* stated—the day before is palpably inadequate.

Despite the fact, however, that both the specifications of errors and the objections to the Court's failure to give certain requested instructions were improperly presented, we are considering all the substantial points raised by the appellants.

### 4. *The Applicable Statutes*

Count One is based upon the conspiracy statute, 18 U.S.C.A. § 371, which reads as follows:

> "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

2. See also Gila Valley Irr. Dist. v. United States, 9 Cir., 1941, 118 F.2d 507, 510 (six errors enumerated in one specification).

3. See also Palmer v. Hoffman, 1943, 318 U.S. 109, 119, 63 S.Ct. 477, 87 L.Ed. 645; Goldstein v. United States, 9 Cir., 1934, 73 F.2d 804, 806; Brown v. United States, 9 Cir., 1953, 201 F.2d 767, 770; United States v. Furlong, 7 Cir., 1952, 194 F.2d 1, 3, certiorari denied, 1952, 343 U.S. 950, 72 S.Ct. 1042, 96 L.Ed. 1352; Enriquez v. United States, 9 Cir., 1951, 188 F.2d 313, 316.

"If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor."

Counts Three to Ten, inclusive, have as their applicable statute 26 U.S.C.A. § 2707(c), the text of which follows:

"(c) Any person required under this subchapter to collect, account for and pay over any tax imposed by this subchapter, who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this subchapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution."

The "subchapter" referred to in the above subsection (c) is "Subchapter A—Pistols and Revolvers", which is part of Chapter 25 of Title 26 of the United States Code—a chapter that deals with "Firearms". Since the present indictment, despite its allegedly "hair-raising" and "horrendous" results, does not deal with weapons of war, we must look elsewhere for its ultimate penal source.

It will be recalled that Counts Three to Six, inclusive, allege that the appellants attempted to defeat and evade *income* taxes required to be withheld from wages. This necessitates recourse to Subchapter D of Chapter 9 of 26 U.S.C.A. —a subchapter dealing with "Collection of Income Tax at Source on Wages". Chapter 9 embraces the subject of "Employment Taxes". Section 1627, in Subchapter D, reads as follows:

"§ *1627. Other laws applicable*

"All provisions of law, including penalties, applicable with respect to the tax imposed by section 1400 shall, insofar as applicable and not inconsistent with the provisions of this subchapter, be applicable with respect to the tax under this subchapter."

We must refer therefore to Section 1400, which is part of Subchapter A, "Employment by Other Than Carriers". That subchapter, which relates to the Social Security tax, is cited as the "Federal Insurance Contributions Act". Like Subchapter D, supra, it is part of Chapter 9, supra. But since Section 1400 merely gives the "Rate of tax" on employees that come under Subchapter A, we must look to some other section in the same subchapter for the final link in the statutory chain that is to bind the appellants to Section 2707(c), cited in Counts Three to Ten, inclusive, of the present indictment.

That vital link is Section 1430, which is as follows:

"*Other laws applicable*

"All provisions of law, including penalties, applicable with respect to any tax imposed by section 2700 or section 1800, and the provisions of section 3661, shall, insofar as applicable and not inconsistent with the provisions of this subchapter, be applicable with respect to the taxes imposed by this subchapter."

Section 2700, supra, is part of Subchapter A of Chapter 25, "Firearms", of which the crucial Section 2707(c) is also a part. Section 2700 itself deals only with "Rate", "Exemptions", and "Computation in special cases."

Counts Seven to Ten, inclusive, charge the appellants with attempting to defeat and evade "a large part" of the *excise* taxes for 1948. Here again 26 U.S.C.A. § 2707(c) is given as the violated statute, and here again we must have recourse to Section 1430, supra, which, so far as employees are concerned, links the Social Security tax to the penal provisions of the "Pistols and Revolvers" subchapter.

Subchapter C, "Tax on Employers of Eight or More", is applicable to these four counts, insofar as they relate to "the

excise taxes on employers". Like Subchapter A, Subchapter C contains a section linking it with Section 2707(c), through Section 2700, as explained above:

"§ *1610. Other laws applicable*

"All provisions of law (including penalties) applicable in respect of the taxes imposed by section 2700, shall, insofar as not inconsistent with this subchapter, be applicable in respect of the tax imposed by this subchapter."

We come finally to the last ten counts of the indictment, Counts Eleven to Twenty, inclusive. Each of these counts cites 26 U.S.C.A. § 145(b), the text of which follows:

"*Failure to collect and pay over tax, or attempt to defeat or evade tax.* Any person required under this chapter to collect, account for, and pay over any tax imposed by this chapter, who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution."

It will be recalled that, as to these Counts Eleven to Twenty, inclusive, each appellant was found guilty of the lesser offenses of willful failure to supply information, etc. The "lesser offenses" referred to are defined in 26 U.S.C.A. § 145 (a), which reads as follows:

"*(a) Failure to file returns, submit information, or pay tax.* Any person required under this chapter to pay any estimated tax or tax, or required by law or regulations made under authority thereof to make a return or declaration, keep any records, or supply any information, for the purposes of the computation, as-

sessment, or collection of any estimated tax or tax imposed by this chapter, who willfully fails to pay such estimated tax or tax, make such return or declaration, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than one year, or both, together with the costs of prosecution."

### 5. *The Admitted Facts*

The record is long, and the machinations of the appellants were intricate and devious. It would unduly burden an already overlong opinion to give all the details of the concealments and evasions revealed by the voluminous transcript. From the admissions contained in their own briefs, however, we can gather what manner of men these appellants are.

There is very little conflict in the evidence. The four appellants were engaged in illegal bookmaking activities in Los Angeles County, California, as co-partners. Even the firm name is shrouded in murk. In the record, the partnership is shown to have been variously called "Colby Collection Agency", "Colby Collection Service", "Cobert Collection Agency", and "Cobert Collection Service".

This bookmaking establishment was maintained on premises also occupied by the Guarantee Finance Company, which was owned by the four appellants. The bookmaking activities were maintained as a clearinghouse for the use of other bookmakers, who conducted their own betting operations in the same county, and had their own individual gambling customers.

These "other bookmakers" are the occasion for some more of that "double talk" with which this record is replete. "These independent bookmakers," Kobey and Cobert, two of the appellants, say in their opening brief, "are referred

to in the record occasionally as 'agents', but they were in no sense agents of the appellants, as the use of the word might imply."

The other two appellants, Harry and Albert Kogus, however, who are brothers, freely refer to these "individual bookmakers" as their "agents", adding that "the terms 'agent' and 'bookmaker' (are) used interchangeably throughout the transcript and throughout this brief." It is the view of this Court that these so-called "independent" bookmakers were, in fact and in law, the actual agents and employees of the appellants, and the jury, by its verdict, must have so found.

It is admitted that some of the betting "markers" and "weekly top sheets" were in fact destroyed by the "bookmakers" on the advice of the appellants. The appellant Harry Kogus, for example, testified that he told the "agents":

> "If I were them I would have no bookmaking paraphernalia around where it could be found.
>
> \* \* \* \* \*
>
> " \* \* \* we told them \* \* \* if I were they, I would have nothing around that would incriminate them."

The appellants have attempted to explain this destruction of records by asserting that it was "to avoid detection by state, county, and city authorities but in no circumstance for the purpose of evading taxes due the Federal Government."

▇ The jury apparently disbelieved —as it was entitled to disbelieve—this pious disclaimer of any intention to deceive the United States.

On January 27, 1949, B. E. Burchfiel, chief investigator for the Division of Corporations of the State of California, seized certain books and records at 1749 East Florence Avenue, the partnership's headquarters. The appellants assert that all the information in the destroyed betting markers had been transferred into the seized records "and were available to the Federal authorities".

Be that as it may, the fact remains that the appellants' criminal intent in counseling the destruction of the "markers" and "weekly top sheets" might well have been inferred by the jury from the entire record.

Finally, the appellants admit that "the procedure employed was to designate the bookmakers and their betting customers and their wagers on various sheets upon which the bettors and the bookmakers with whom the bettors made their wagers were identified by first names, nicknames, or by symbols."

Here again counsel for the two pairs of appellants disagree in their explanations. The Kogus brief asserts that "This use of code names was to protect the individual bookmakers who did not want anyone to know their clients, for that was their stock in trade".

Though counsel for the Kogus brothers were referring to the use of code names "for the various bookmakers or agents", they may have had in mind the reason for the use of such *noms de books* to designate the *customers* of the bookmakers. Harry Kogus testified that no "agent" wanted "anybody to know who his customers were".

The Kobey-Cobert attorneys, on the other hand, explain that the subterfuge was resorted to so as—

> "To make it difficult for the enforcement agencies of the State of California to discover the identities and names of the independent bookmakers and of their betting customers."

In his testimony, Harry Kogus gave three explanations. We have already quoted one of them. In addition, he offered two others—each one different from that offered by his own counsel:

> " \* \* \* if these markers or statements were ever confiscated by the local authorities, why, the agent didn't want his full name on there or true name on those markers."

So far, Harry Kogus agreed with the theory advanced by counsel for *Kobey*

and *Cobert.* But he also had a third theory of his own:

"It helped the clerks a lot because in so many cases they were long names, and names that were hard to understand over the telephone, and we tried to keep these down to as many three-letter names as possible, or four, and used numbers as much as possible. Well, we kept it down in most cases below six letters so it wouldn't be too hard for the clerk."

In any event, these varied explanations are quite confusing. These appellants have woven a tangled web indeed!

6. *The Denial Of The Motion For A Bill Of Particulars Was Proper.*

In connection with the first Kobey-Cobert specification of error, we find that on June 29, 1951, the appellants filed a motion for a bill of particulars with regard to Count One. They complained that nowhere could "it be determined from the indictment the persons whose names or identities are referred to, nor the amounts paid, nor the persons to whom any money was paid by the defendants, nor what memoranda, accounts, records and books were destroyed, nor the nature of such memoranda, etc., or what memoranda and records were false, fictitious and misleading, or in what particulars the prosecution contends they were false," etc.

In the first place, the argument made below in support of this motion—"That the books and records had been taken from the possession of the appellants by the California state authorities"— was not a cogent one. The record shows that the appellants were furnished with photostatic copies of most of the documents that the appellee planned to use at the trial, and that, furthermore, the District Judge's law clerk was deputized as a deputy county clerk so that other documents would be available to the appellants. These latter documents were

those that had been seized by Mr. Burchfiel, supra.

■ Secondly, it is well settled that a motion for a bill of particulars is addressed to the sound discretion of the District Court.[4] The record shows that this discretion was not abused. As we have just seen, the District Judge was careful to guard the rights of the appellants.

As part of this same specification of error, Kobey and Cobert complain that denial of their motion for a continuance of the trial to a date not earlier than in September, 1951, forced them to go to trial on August 6, 1951. They assert that because of "the shortness of the time between the return of the indictment (June 12, 1951), and the trial date (August 6, 1951) appellants had no reasonable opportunity to have these books and records audited and analyzed by appellants' new auditor Manning," etc. As we shall see hereafter, however, the case was recessed to September 4, 1951, and the taking of testimony was completed on September 19, 1951.

It should be borne in mind, moreover, that the case was tried in the afternoons, so that counsel would have time to prepare their work in the mornings. This gave them additional time to study the records with their auditor.

This first specification is without merit.

7. *The Appellants Were Not Denied The Assistance of Counsel Of Their Own Choosing.*

Specification of Error No. 2, urged by the appellants Kobey and Cobert, complains that the "denial of (their) motion for the continuance of the trial after (their) chief counsel, Mr. (David H.) Cannon, had been stricken seriously ill, and unable to proceed, compelled the appellants to proceed with the trial and thus be deprived of the effective aid * * * of counsel of their own choosing, in violation of the Fifth and Sixth

---

4. Nye & Nissen v. United States, 9 Cir., 1948, 168 F.2d 846, 851, affirmed, 1949, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919;

Stillman v. United States, 9 Cir., 1949, 177 F.2d 607, 615.

Amendments to the United States Constitution".

This serious charge requires a careful scrutiny of the record, with particular regard to the chronology of events.

Mr. Cannon and William B. Beirne were the attorneys for the four appellants from the dawn of the present record to a time beyond the critical events that are about to be narrated. Both these gentlemen have denied that Mr. Beirne represented all the appellants. Mr. Beirne himself told the lower court that he represented "solely * * * one of the Koguses", but "By a mistake * * * (he) was listed as attorney for all of the defendants."

In their closing brief, Mr. Cannon and his present associate go even farther. They deny that Mr. Beirne was appellants' counsel at all! They later qualify this denial by saying that he "was not appellants' counsel of their own choice".

All these denials, whether qualified or unqualified, are flatly contrary to the record. For example, on June 29, 1951, there was filed a group of motions, including the one for a bill of particulars, supra, which was signed by both Mr. Cannon and Mr. Beirne, as attorneys for the four appellants. On July 25, 1951, they both signed an *affidavit* describing themselves the same way. The same is true of a motion "for further continuance" filed on behalf of the appellants, and making the affidavit of July 25, 1951, supra, a part thereof. In addition, in the various orders and in the minutes, we find constant references to both gentlemen as being attorneys for all the appellants.

We now proceed to the crucial chronology.

The 68 defendants were tried in groups. The trial of the four appellants and seven other defendants commenced on August 6, 1951. During the first few days thereafter, Mr. Beirne took an active part in the conduct of the defense, equally with Mr. Cannon. Up to that time, there was no suggestion that Mr. Cannon was "chief counsel" or that "Mr. Beirne's association with Mr. Cannon was primarily for the purpose of assisting Mr. Cannon on certain phases of the case." To all intents and purposes, Mr. Beirne's authority as counsel was co-ordinate with that of Mr. Cannon, who, at that time at least, gave no indication that he had "supervision of the trial".

On the afternoon of Friday, August 10, 1951, Mr. Cannon suddenly addressed the Court thus:

"Mr. Cannon. If the court please, may I be excused? I have been here this morning, but I cannot stay longer. Mr. Beirne will carry on in my absence, but I simply can't stay here. It would be against the advice of my doctor."

The Court of course excused Mr. Cannon. Mr. Beirne stated that he was not prepared to examine witnesses "here on out", but that if he had to, he would. (Mr. Beirne had been doing very nicely up to that point.) He suggested a recess until the following Monday. The trial was resumed for the rest of that Friday afternoon, but the case was recessed progressively to August 21, 1951, August 27, 1951, and finally to September 4, 1951, when Mr. Beirne asked for a still further continuance, "for the last time", until Monday, September 10, 1951. Mr. Beirne promised that on the latter date Mr. Cannon, then "home from the hospital", would be available. As a matter of fact, according to the Kobey brief itself, "Mr. Cannon was not able to return again to the trial of the case, and was physically unable to take further part in the proceedings." In other words, Mr. Beirne, though a good lawyer, was a poor prognosticator!

In support of his plea for a further continuance, Mr. Beirne modestly stated that he "would feel safer * * * if Mr. Cannon were present to represent these defendants", and, in a surge of self-immolation, added:

"I haven't the slightest conception of the difference between a

debit and a credit and I think it will be proved here in my cross-examination of the witnesses. No accountant and no certified public accountant, no auditor, has been able to hammer that into my head during this period."

Neither the Court nor the prosecution shared Mr. Beirne's low estimate of his own capabilities. When Mr. Cannon first became sick, the Court had told Mr. Beirne, "I am sure you will do well." Counsel for the appellee stated:

"Of course, I think Mr. Beirne is the type of counsel, and we all know his reputation, that there aren't any better prepared attorneys in Los Angeles or more able."

At any rate, counsel for the appellee and for some of the appellants' co-defendants opposed a continuance.

The Court ruled:

"You are equally divided—the defendants' attorneys are equally divided on the subject and the motion for further continuance will be denied."

■ In the light of the entire record, it is this Court's opinion that the judge below did not abuse his discretion in refusing to grant the appellants any further continuances. Mr. Beirne, an attorney of their own choice, conducted the remainder of the case in a workmanlike manner.

8. *The Indictment Did Not Need To Allege That The Appellants Were Required To Divulge The Amounts Paid, To Keep Accurate Records, Etc.*

Specification of Error No. 3, filed by the appellants Kobey and Cobert, asserts that "The Court erred in denying appellants' motions to dismiss the indictment and to acquit the appellants, made by them before trial on the ground that the indictment did not state an offense."

In their briefs, these two appellants launch a manifold attack upon the indictment. Each objection will hereinafter be considered separately.

The gravamen of the first criticism of the indictment is that "Nowhere is there any allegation of any requirement to divulge, and if so to whom, the amounts of money transferred or paid, nor is there any allegation as for (sic) what purpose such information should be divulged", etc. This emphasis upon the indictment's failure to allege certain legal *requirements* imposed upon the appellants, is expressed in several pages of the brief.

■ It will be recalled that every one of the nineteen counts of the indictment on which conviction was had, charges the appellants either with conspiring to "defraud" or with attempting to "defeat and evade" in connection with taxes. Under such allegations, no averment of "duty" or "requirement" is necessary.

In United States v. Troy, 1934, 293 U.S. 58, 61–62, 55 S.Ct. 23, 24, 79 L.Ed. 197, the Court emphasized that under a "defeating" allegation, no averment of "duty" is required:

"If the charge against appellee had been failure to make return, or pay over the tax for the corporation it, might have been necessary to allege and show some duty in respect thereto; but, when charged with willful effort to defeat the tax by presenting a false return, no allegation of duty to make the return was necessary. The alleged act sufficiently indicated appellee's criminal intent."

9. *The Eighteen Substantive Counts Are Not Vulnerable To Attack Under The "Course Of Conduct" Or "Single Impulse" Rule.*

■ Still under their Specification No. 3, Kobey and Cobert complain that "by breaking down this one 'course of conduct' or at most two 'courses of conduct' into eighteen counts, the prosecution has exacted penalties far in excess of the maximum," etc.

In support of their theory, the appellants quote from United States v. Uni-

versal C. I. T. Credit Corporation, 1952, 344 U.S. 218, 224, 73 S.Ct. 227, 231:

> "The offense made punishable under the Fair Labor Standards Act [29 U.S.C.A. § 201 et seq.], is a course of conduct. Such a reading of the statute compendiously treats as one offense all violations that arise from that singleness of thought, purpose or action, which may be deemed a single 'impulse,' a conception recognized by this Court in the Blockburger case, supra [Blockburger v. United States, 1932], 284 U.S. [299] at page 302, 52 S.Ct. [180] at page 181 [76 L. Ed. 306], quoting Wharton's Criminal Law (11th ed.) Section 34."

The Universal case, however, can be distinguished from the one at bar, both on the facts and on the law. In that case, thirty-two counts were laid: six for failure under Section 6 of the Act to pay minimum wages, twenty for violation of the overtime provisions of Section 7, and six for failure to comply with the requirements for record-keeping under Section 11.

The Supreme Court was careful to point out that it was deciding the Universal C. I. T. case in accordance with the mandate of *the particular statute then before it,* and was not attempting to lay down a general rule:

> "Instead of balancing the various generalized axioms of experience in construing legislation, regard for the specific history of the legislative process that culminated in the Act now before us affords more solid ground for giving it appropriate meaning." 344 U.S. at page 222, 73 S.Ct. at page 230.

Emphasizing the closeness of the case and the narrowness of the problem there presented, the Court continued:

> "It would be self-deceptive to claim that only one answer is pos-

sible to our problem. *But the history of this legislation and the inexplicitness of its language* weigh against the Government's construction of a statute that cannot be said to be decisively clear on its face one way or the other. Because of the *history and language of this legislation,* the case is not attracted by the respective authority of two cases pressed upon us. In re Snow, 120 U.S. 274, 7 S.Ct. 556, 30 L.Ed. 658, and Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306." (Emphasis supplied.) 344 U. S. at page 224, 73 S.Ct. at page 231.

In the Blockburger case, supra, cited in United States v. Universal C. I. T. Credit Corporation, supra, the Supreme Court quoted with approval the following sentence from Wharton, supra:

> "If successive impulses are separately given, even though all unite in swelling a common stream of action, separate indictments lie." 284 U.S. at page 302, 52 S.Ct. at page 181.

In Norwitt v. United States, 9 Cir., 1952, 195 F.2d 127, 133–134, certiorari denied, 1952, 344 U.S. 817, 73 S.Ct. 11, this Court disposed of what amounted to this same "course of conduct" argument.[5]

Plainly related to this "single impulse" argument of the Kobey-Cobert brief is the Kogus contention that "The conspiracy count was merged in the substantive counts and, therefore, appellants were convicted of the same crime when found guilty of the conspiracy count and the substantive counts".

The short answer to this objection is found in United States v. Bayer, 1947, 331 U.S. 532, 542, 67 S.Ct. 1394, 1399, 91 L.Ed. 1654;

> "The indictment is for conspiring and we have but recently reviewed the nature of that offense. Pinker-

---

5. See Judge Sawtelle's exhaustive discussion of the somewhat cognate contrast between "transaction" and "cause of action" in equity, in United States v. Pan-

American Petroleum Co., 9 Cir., 1932, 55 F.2d 753, 776–778, certiorari denied, 1932, 287 U.S. 612, 53 S.Ct. 14, 77 L.Ed. 532.

ton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489. Its essence is in the agreement or confederation to commit a crime, and that is what is punishable as a conspiracy, if any overt act is taken in pursuit of it. The agreement is punishable whether or not the contemplated crime is consummated. *But the same overt acts charged in a conspiracy count may also be charged and proved as substantive offenses, for the agreement to do the act is distinct from the act itself.*" (Emphasis supplied.)

10. *There Was Substantial Evidence To Support The Verdict And Judgment.*

■ Kobey-Cobert Specification No. 4 complains that "There was no substantial evidence to sustain the charges in the indictment," etc.

In our discussion of "The Admitted Facts", supra, we have adverted to several subterfuges practiced by the appellants, such as the destruction of records and the use of nicknames. It would unduly lengthen this opinion to unfold the "intricacies" of the appellants' admitted "complicated" and "complex" "double entry bookkeeping". Suffice it to say that, after considering the entire evidence, the jury may well have come to the conclusion that the appellants' accounting system was not merely that of "double entry", but also that of "double pay rolls", "double dealing", "double talk"— and "double cross"!

Similarly, the jury was entitled to infer from all the facts that the appellants did not construct watertight bulkhead compartments in dealing with the state and the federal tax authorities—cramming one compartment with nicknames and torn betting markers, and packing the other compartment with pure virgin snow!

As part of their argument in support of Specification No. 4, the appellants Kobey and Cobert assert that "Illegal businesses are not within the purview of the Social Security Act".

So far as the conspiracy count is concerned, the appellants concede that "This is a question of first impression as far as we know". And the burden is upon them to show that the Court below erred either as to the law or as to the facts.

In Rutkin v. United States, 1952, 343 U.S. 130, 137, footnote 8, 72 S.Ct. 571, 575, 96 L.Ed. 833, which seems to have escaped the attention of counsel, Mr. Justice Burton has collected an impressive list of decisions to support his statement that "There has been a widespread and settled administrative and judicial recognition of the taxability of unlawful gains of many kinds under § 22(a) (of the Internal Revenue Code [26 U.S.C.A. § 22(a)], defining "gross income")." Among the types of income held to be taxable has been that derived from "race track bookmaking".[6]

Furthermore, the Supreme Court has held that the ambit of the Social Security Act is expansive rather than limited. In United States v. Silk, 1947, 331 U.S. 704, 711–712, 67 S.Ct. 1463, 1467, 91 L.Ed. 1757, the Court used the following language:

"Since Congress has made clear by its many exemptions, such as, for example, the broad categories of agricultural labor and domestic service, 53 Stat. 1384, 1393, that it was not its purpose to make the Act cover the whole field of service to every business enterprise, the sections in question are to be read with the exemptions in mind. *The very specificity of the exemptions, however, and the generality of the employment definitions indicates that the terms 'employment' and 'employee,' are to be construed to accomplish the purposes of the legislation. As the federal social security legislation is an attack on recognized evils in our national economy, a constricted interpretation of the phrasing by the courts would not comport with its purpose.* Such an interpretation would only make for a

---

6. See also Goldbaum v. United States, 9 Cir., 1953, 204 F.2d 74, 77.

continuance, to a considerable degree, of the difficulties for which the remedy was devised and would invite adroit schemes by some employers and employees to avoid the immediate burdens at the expense of the benefits sought by the legislation. These considerations have heretofore guided our construction of the Act. (Cases cited.)" (Emphasis supplied.)

The appellants Kobey and Cobert assert that under Section 1426 of the Internal Revenue Code, which is part of Chapter 9, Subchapter A, supra, "an employee is one who is engaged in a legitimate business". This is an incorrect paraphrase of Section 1426(d), the full text of which follows:

*"(d) Employee.* The term 'employee' includes an officer of a corporation, but such term does not include (1) any individual who, under the usual common-law rules applicable in determining the employer-employee relationship, has the status of an independent contractor or (2) any individual (except an officer of a corporation) who is not an employee under such common-law rules."

There is no suggestion here that the employment must be lawful. As we have seen, to be taxable, wages need not be derived from legitimate employment.

It is asserted also that under California law, contracts of bookmakers with their employees are "illegal, void and unenforceable". It is unquestionable that the *validity* of California contracts should be tested under California law; but the *Federal taxability* of the proceeds from such contracts is a matter of Federal law.

 It is the holding of this Court that illegal businesses come within the ambit of the Social Security Act.

Finally, we come to the problem of the appellants' double pay rolls, which Kobey and Cobert describe as relating to "the basic tenet of the prosecution".

Cameron L. Handley, a certified public accountant employed by the four appellants, identified their two pay rolls, hereinafter referred to as Exhibits 31 and 33. Exhibit 31 was described as "a record of the pay roll of the Colby Collection Agency for the period" probably commencing on August 30, 1948, and extending to January 22, probably of the year 1949. With certain exceptions it was entirely in Handley's own handwriting. It is agreed that Exhibit 31 was used as the basis for making the income tax returns and social security deductions.

Exhibit 33 was a "subsidiary pay roll, which was not to be paid in currency". On that pay roll, no social security deductions or withholding deductions were made by Handley on the basis of the figures indicated after the names of the employees. The appellee points out that the failure to file quarterly returns showing "withholding", old age benefits and unemployment insurance, required in Exhibit 33, caused the discrepancies charged in Counts Three to Ten, inclusive, and that the failure to report the additional salaries reflected in Exhibit 33 forms the basis of Counts Eleven to Twenty, inclusive.

A careful study of the record convinces us that in this respect, too, there was substantial evidence to support the jury's verdict.

11. *This Court Need Not Consider Asserted Omissions In The Charge That Were Not Made The Subjects Either Of Requests Or Of Objections.*

 Specification No. 5 of the Kobey-Cobert brief complains that the Court "erred in failing to charge the jury on all of the elements of the offenses charged in the indictment, such as what constituted an employer-employee relationship; * * * what constituted wages * * *, net income and gross income"; and what constitutes the essential elements of conspiracy.

These appellants admit, however, that "Such omissions in the instructions were not specifically excepted (sic) to by the

appellants," but they assert that such omissions "constitute such serious and plain error that the appellate court should take notice thereof even in the absence of specific exceptions (sic)". (The term used in Rule 30 is "objection".)

Furthermore, a glance at the appellants' requested instructions reveals that not only was the omission of the instructions now being considered, not the subject of any objections on the part of the appellants, but that except as to conspiracy, they did not *request* such instructions in the first place.

As to conspiracy, it is true that the four appellants requested instructions dealing with what they regarded as "all of the essential elements" of that crime "as charged in the first count of the indictment as applicable to the alleged violations under the Internal Revenue Code". But even as to these instructions, as the Kobey brief admits, there were no objections to the Court's failure to give them. In any event, the trial judge adequately instructed the jury on the law of conspiracy.

It will be noted that the other alleged omissions now complained of were not of instructions of a "stock" nature, but referred to subjects specially related to the facts at bar. In such a situation, adherence to Rule 30 is particularly necessary.

In this connection, we may take a passing glance at part of Specification 6A of the Kobey-Cobert brief and at Specification 1(o) of the Kogus brief. Kogus concedes that the instruction complained of was not "seasonably objected to, as required by Rule 30 * * *", but contends that "An appellate court may notice error even though not seasonably objected to," etc.

The instruction complained of was as follows:

"It is not necessary for the prosecution to prove knowledge of the accused that a particular act or failure to act is a violation of law. Nor is ignorance of the law available as a defense to a person who has committed a crime. Everyone is presumed to have knowledge of what the law forbids and what the law commands. However, evidence that the accused acted or failed to act because of ignorance of the law, is to be considered in determining whether or not the accused acted or failed to act with specific intent as charged."

The error complained of was the giving of "an instruction that ignorance of the law is no excuse when the gist of the crime involved is 'knowledge'." This type of instruction, likewise, closely related as it is to the facts of the case, comes peculiarly within the sweep of Rule 30.

██ Nevertheless we may observe that, read as a whole as it must be read—the instruction is substantially correct. Despite its inartificial phrasing, the giving of it does not constitute reversible error.

Finally, all four appellants object to the following instruction given by the Court below:

"Good motive is never a defense where the act done is a crime. If a person does intentionally an act which the law denounces as a crime, motive is immaterial except insofar as it may aid determination of the issue as to intent."

██ After the charge to the jury had been given, Mr. Beirne engaged in a considerable colloquy with the Court on the subject of the above instruction. Counsel's final words on the subject were as follows:

"I am not criticizing your Honor's instruction. I am objecting from the general standpoint of the difference between motive and intent."

This clearly was not a compliance with Rule 30. It was not a "distinct" statement of the "matter" to which counsel was objecting. Indeed, it wound up with a "distinct" *disavowal* of criticism of the instruction.

Furthermore, the specification in neither brief conforms to the requirement

of Rule 18(2)(d) of this Court, supra; namely, it does not state particularly "the grounds of the objections urged at the trial".

The Kobey-Cobert brief quotes two paragraphs of the colloquy between Court and counsel, but significantly omits the upshot of it all; namely, that counsel was not really criticizing the instruction. The Kogus brief does even less: it quotes no part of the colloquy at all, but merely says that "The ground for objection stated at the time of trial was that appellants' entire defense is good faith, and that this instruction vitiates that defense". Here again, the "lame and impotent conclusion" of the dialogue is sedulously omitted.

In addition to all this, this Court does not believe that the instruction as given was erroneous. The role that motive plays as an element of crime, as stated by the Court below, conforms to hornbook law, as thus expressed in 22 C.J.S., Criminal Law, § 31a, pages 88, 89:

> "Motive is not an essential element of a crime. The most laudable motive is no defense where the act committed is a crime in contemplation of law; * * *. Proof as to motive may be of assistance in throwing light on the intent with which the act was committed, * * *."

The Court's charge was full and comprehensive, consisting of 94 separate instructions and covering 54 pages of the printed transcript. Read as a whole, the charge of the learned Judge below fairly and adequately instructed the jury on the applicable law.

12. *Neither The Details Of The Appellant's Illegal Gambling Operations Nor The Argument Of The United States Attorney Formed The Basis Of Reversible Error.*

In their Specification No. **7**, Kobey and Cobert complain that they "did not have a fair trial within the concept of the Fifth and Sixth Amendments to United States Constitution in that the illegal gambling operations were accentuated (a) *by unnecessary details* of the gambling operations, same being irrelevant to the charges made in the indictment; and (b) by the improper argument of the United States Attorney, in which he injected false issues and misrepresented the evidence".

In their discussion of this specification, these two appellants also intimate that they were denied due process because their sentences were too severe. Since this latter complaint is made a part of the basis of Specification No. 8, infra, we will defer consideration of it.

We need not spend much time on this seventh specification. The "details of the gambling operations" of the appellants were necessary to acquaint the jury with the full scope and magnitude of the illicit enterprise.

As for the argument of the United States Attorney, we have read every word of it that is reproduced in the record. The appellants have "underscored" three pages of it, but have failed to point out in what respect those three pages, or any other pages, constituted "improper argument" or "injected false issues" or "misrepresented the evidence".

There is absolutely no merit to this Specification.

13. *The Asserted "Severity" Of The Sentence Is Not Reviewable Here.*

Specification No. 8 in the Kobey-Cobert brief complains that the sentence imposed upon the appellants was "unusual and cruel in violation of Amendment Three (sic) to the United States Constitution." The appellants no doubt had in mind Amendment *Eight.*

This Constitutional attack upon the sentence is twofold:

First, "the eighteen substantive counts all collectively charged but one single offense, which should not have been split up in 18 separate offenses so as to permit of the imposition of an 18 times multiplied punishment".

This point has already been discussed in Section 9 of this opinion, dealing with

the "course of conduct" or "single impulse" principle.

 Second. Kobey and Cobert attack the "severity" of the sentence as constituting a denial of due process of law. In support of this contention, these appellants *twice* cite Townsend v. Burke, 1948, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690, as holding "that the defendant was denied due process on the ground that his sentence was too severe".

This is an astounding misrepresentation of the Supreme Court's holding in that case, as may be seen from the following language on page 741 of 334 U.S., on page 1255 of 68 S.Ct. of the opinion— a passage much stronger than that pointed out by the appellee:

> *"We would make clear that we are NOT reaching this result because of petitioner's allegation that his sentence was unduly severe. The sentence being within the limits set by the statute, its severity would not be grounds for relief here even on direct review of the conviction, much less on review of the state court's denial of habeas corpus. It is not the duration or severity of this sentence that renders it constitutionally invalid;* it is the careless or designed pronouncement of sentence on a foundation so extensively and materially false, which the prisoner had no opportunity to correct by the services which counsel would provide, that renders the proceedings lacking in due process." (Emphasis supplied.)

14. *Conclusion.*

Despite the multipronged assault made upon them by two batteries of astute and resourceful counsel, these convictions must stand. The lengthy record unfolds a sordid tale of tax evasion, concealment, and manipulation.

The trial court was careful to safeguard the appellants' substantial rights. The evidence of guilt was strong. The judgments are affirmed.