BENATAR et al.
v.
UNITED STATES.
No. 13638.

United States Court of Appeals
Ninth Circuit.
Jan. 6, 1954.

Rehearing Denied Feb. 3, 1954.

Denman, Chief Judge, dissents.

Leo R. Friedman, San Francisco, Cal., for appellants.

Lloyd H. Burke, U. S. Atty., Robert F. Peckham, Asst. U. S. Atty., Robert G. Thurtle, Trial Atty., Enforcement Division, Bureau of Internal Revenue, San Francisco, Cal., for appellee.

Before DENMAN, Chief Judge, ORR, Circuit Judge, and LEMMON, District Judge.

LEMMON, District Judge.

A retail drug corporation, its president, its office manager, and the faithless chief accountant in the office of the Collector of Internal Revenue at San Francisco—these were the protagonists of the venal conspiracy involved in this appeal.

When caught, the tax official attempted suicide. He later pleaded guilty to falsifying and destroying Government records, and was sentenced to prison. The office manager of the corporation was found guilty under the present indictment, was fined, and has not appealed.

The two other conspirators were the appellants herein.

1. *The Indictment*

As used herein, "Benatar" refers to Morris V. Benatar and "Benatars" refers to the corporate appellant.

Benatar, president of Benatars; Benatars, a California corporation; and Samuel W. Potter, the office manager of Benatars, were all three charged with a conspiracy "to defraud the United States by impairing, defeating, and obstructing the proper and lawful functions of the United States, towit, the Bureau of Internal Revenue, etc., in ascertaining, computing, levying, assessing and collecting taxes, and penalties which may be due thereon," etc.

"The object of the conspiracy was to be accomplished as follows":

Benatar and Potter were to file withholding and employment tax returns for Benatars in a timely manner, but without the payment of the taxes due thereon; by the payment of the said taxes by Benatar and Potter on behalf of Benatars, at a time when penalties and interest were required to be added thereto; and by the acceptance by Edwin M. Furtado, in his official capacity, of said payment of taxes without the payment or addition of accrued penalties and interest, and without making demand, etc.; thereby to deprive the United States of $6,000.

Furtado, named as a conspirator but not as a defendant, was Chief of the Accounts Section, Wage and Excise Tax Division, in the office of the Collector of Internal Revenue at San Francisco.

It is alleged that the conspiracy commenced on November 1, 1948, and continued until the filing of the indictment, April 15, 1952.

Fourteen overt acts are set forth.

2. *The Verdict And The Judgments*

On October 3, 1952, the jury found all three defendants guilty as charged. On October 24, 1952, Benatar was sentenced to imprisonment for one year and a day; Benatars, to pay a fine of $10,000 and to bear with Benatar the costs of prosecution, jointly and severally; and Potter, to pay a fine of $2,500. Potter has not appealed.

3. *The Facts*

The record and exhibits are voluminous. It would serve no useful purpose

to attempt an extended summary of their contents. For an understanding of this appeal, it will be sufficient to outline a few of the salient facts.

Frank Lewit Blote, an inspector for the Bureau of Internal Revenue, testified regarding the procedure relating to the collection of withholding and Social Security taxes during 1949–1951. He stated that when a return is received without a remittance, "the return is processed on an assessment list". Blote continued:

> "The list is certified by the Commissioner (at Washington) as to the total amount of taxes due as a result of that list. It comes back in a Form 17, the First Notice and Demand for the payment of the taxes set out."

In other words, "Form 17 was always issued after the time for payment had gone by".

Leo Schmidts, accountant-auditor for Benatars for ten and a half years, testified that while he was handling these tax returns, the custom was to send the check with the tax return.

After 1947, however, the defendant Potter supervised the preparation of tax returns. Then it became "the custom to wait until the first demand, the Form 17, was sent" before paying the tax.

Already we see a dilatory policy on the part of Benatars in the payment of its lawful taxes. As the appellee correctly observes, "Benatar's motive for not making the timely payments to the Collector was simply to use the government's money in the operation of his business".

We shall see presently that this policy of delay soon crystallized into one of downright evasion, subterfuge, and falsification.

At the time that he testified at the trial, Furtado was serving a sentence in a Federal prison, having pleaded guilty on four counts of falsifying Government records and destroying assessment sheets in the Internal Revenue office.

It was not long before Furtado and Benatars became "as thick as thieves". In 1951 "he was there possibly almost every day". At various times he left money at Benatars, and it was placed into the store safe. At other times he would "leave money in the cash booth to be left in an envelope; and he would take it out at various times".

In a sworn statement to special agents of the Intelligence Division, Bureau of Internal Revenue, Benatar declared that he saw Furtado "very often"; that Furtado was "always very friendly"; that "we" bought some "appliances" for Furtado and "charged him a little over cost"; that Benatar thought that "Potter complained to me about the liberties Mr. Furtado took in our office", but that Benator "didn't take any steps to attempt to stop Mr. Furtado from these practices"; and that "On one occasion in 1951 Mr. Furtado told me he borrowed some money and wanted to leave it in my store and told me I could use it for a short while if I needed it".

Furtado did some shopping at Benatars too. His method of making his purchases and paying for them was similarly unique. He testified:

> "* * * when I desired some merchandise, either Mr. Schmits (sic) or Mr. Potter would accompany me and I believe, anything I wanted to buy they would make out a ticket with my name and give that ticket to Mr. Potter, who in turn gave it to Rose Batlin, and she would deposit it in her desk and when I got ready to pay for it, she would pull out this slip and run an adding machine tape on it and whatever the price showed I'd pay the amount of money less the amount of interest which I saved Mr. Benatar.

> "Q. What interest do you refer to?

> "Well, various interests I saved by *holding up the issuing* of the 69 and interest, charging him interest

on the form 21." (Emphasis supplied.)

■ We come next to "The Affair Of The Backdated Letter".

David L. Moonie, a certified public accountant, performed some services for Benatars in the fall of 1948, in connection with an additional assessment of the unemployment tax for 1946. He invited Furtado to come over to lunch and gave him the papers in the case; namely, "in the nature of a bill for penalty and interest", together with "some supporting documents". Moonie introduced Furtado to Potter.

When Furtado took the stand, he stated that the tax in question "was not a penalty tax, but a tax for failure to pay *the State of California* on or before the due date". He testified that he told Potter and Moonie that he "knew that that particular type of tax could be abated or set aside if the taxpayer had filed for an extension of time with the Collector's office. Then the law would read that he would get credits as with the State. In other words, apply for an extension of time with the State of California, say that he would get an extension to February 15, an extension the same as with the Collector's office, have to February 15 to pay the State and take off the full credit on the 90 per cent." Continuing, Furtado testified:

"I told Mr. Potter that if I could have a letter dated February 1—I mean, dated prior to January 30, I could put that in the file and then when I made this claim the file clerk naturally, checking the files, making this claim, would then be accepted by the Bureau."

Furtado explained that he meant January 30, *1947*, and that he made this statement to Potter in September, *1948*.

Potter followed the dishonest suggestion, and, "some time in September or October, *1948*", Furtado received the following letter, dated *January 28, 1947*, signed by Potter, and addressed to the Collector of Internal Revenue at San Francisco:

"Due to illness in our office we do not believe we will be able to file our report 940 on time.

"We will appreciate your giving us an extension of time on this report.

"For your information, the State of California has granted us permission to file our Social Security report on March 2, 1947."

Furtado took this letter and placed it into the files, and then prepared the claim for abatement and gave it to Potter for signature and notarization, in November, 1948. The appellants do not deny that Benatar signed the claim, but assert that "he merely signed a paper presented to him by Mooney (sic), believing it was the proper and correct thing to do". Benatar's intent when he subscribed to the document was for the jury to determine, after considering all the circumstances of the case. The jury apparently decided against Benatar's innocent intentions. In this and in other respects, there was substantial evidence to support the verdict.

The conspiracy to defraud the Government of the United States was now in full swing.

Furtado testified that, some time in the latter part of March, 1951, he received from Benatars a check, No. 2677, dated February 11, 1951, for $14,335.-29, representing the corporation's tax liability for withholding and social security taxes for the quarter ending December 31, 1950. He put the check underneath the blotter on his desk—and let it repose there for a while.

The following month he found another account for approximately the same amount of money. His testimony continues:

"* * * so I took the check back to Mr. Potter and gave it to him, told him I didn't need it, he could destroy it as far as I was concerned; he could take his time making this payment; as a matter of fact, he might never have to pay it."

Counsel for the appellants apparently knew what was coming, for he strenuously objected to any testimony relative to "this so-called other account". The trial court overruled counsel's objection, and admitted the testimony, but only for the purpose of establishing whether there was or was not a conspiracy.

So the sordid tale was permitted to proceed.

Furtado testified that he found this convenient account in Form 23–E—the assessment list for fully-paid returns. The account was for $14,334.17, while, as we have seen, the Benatars tax liability for the same quarter was $14,335.-29. The other account was that of the Calo Dog Food Company.

Satan himself could not have provided a handier tool for Furtado's villainy. Furtado drew a line through the number 13423, the master list number of the other account, and, in pencil, wrote in the master list number of Benatars—6457.

In the meanwhile, according to Schmidts, Benatars' accountant-auditor, there was entered the aforesaid Benatars check No. 2677 in the daily bank statements on February 27, 1951, where it "appeared daily" until August 1, 1951—a total of 155 days.

It should be explained here that the daily bank "reports" were prepared under the supervision of Schmidts, and were intended to show Benatar the daily bank balance or cash position of the corporation.

Among the somewhat picayunish criticisms of the appellee's brief interposed by the appellants is the statement that "Appellee would have one believe that check 2677 appeared as an individual item on each daily bank statement, whereas it only appeared in the lump sum representing issued but uncashed checks". Be that as it may, the stubborn fact remains that Schmidts repeatedly testified that the check appeared "daily" during the 155-day period; that such appearance reflected that "the check was outstanding dur-

ing that period"; and that "the fact that the records reflected that the check was outstanding" was brought to Benatar's attention "Only through the daily bank reports", *which he received each day during that period.*

Shortly before August 1, 1951, a "Government supervisor out of Washington" came to the San Francisco office of the Internal Revenue Bureau, and, with the local supervisor, was "checking the records for discrepancies in various accounts". This caused Furtado to get "a little worried about the whole thing".

Accordingly, Furtado went over to Benatars and asked Benatar and Potter for a check for the amount of the tax in question, $14,335.29. He told them that if he had a letter from them stating that the original check was "misplaced"—meaning that the original check was sent to the Collector's office but had never cleared the latter's file—he could "so set the books up" that the penalty and interest of $1,190.41 "could either be refunded to them or credited to another account". Furtado told Benatar and Potter what he would like to have in the letter.

The letter, which was dated August 28, 1951, and was signed by Benatar, stated that "On August 10, 1951, we placed a stop payment on our check #2677 in the amount of $14,335.29."

That statement, of course, was not true, and Benatar knew it was not true. We have already seen that the check was never processed in the Collector's office, but that Furtado first slipped it under his desk blotter and later returned it to Potter. In fact, Lenus Cardoza, assistant auditor of the American Trust Company, San Francisco, on which the check in question was drawn, testified that he had examined the records of the bank for the entire year of 1951, and found that there had been no such stop payment order entered.

The pleas of ignorance and innocence made on behalf of Benatar in this and in other respects are not convincing, and it is not surprising that the jury did not

find them so. Benatar was both the actual and the titular head of the corporation that bore his name. He certainly was not ignorant of the deception surrounding a check for a sum as substantial as $14,335.29. He knew what was going on.

On August 14, 1951 in the course of a conversation in Benatar's office Benatar showed Furtado the above-mentioned letter that the former had written to the Collector of Internal Revenue. Furtado told Benatar that to all appearances the letter "looked all right", and asked him "to be sure and stop payment on that check", referring, of course, to the original check, No. 2677.

During that conference between Benatar and Furtado, there occurred an illuminating bit of dialogue—illuminating as to Benatar's intent when dealing with the Government in tax matters. The following is Furtado's account of that part of the conversation:

"I told him, 'The books are so situated now that we can get a refund of $14,335.00—' I said around fifteen thousand dollars. He kind of smiled and said, 'If you get that, I will give you half of it'. I didn't say anything. He said, 'I will give you two-thirds of it.' Then I took my vacation."

But the Government was not taking a vacation. A month later, the blow fell, and Furtado's house of marked cards came tumbling about his ears:

"* * * that Sunday night— September 16th—a clerk at the office called me up at my home and told me that they had discovered some particular discrepancy in the Benatar account. That is why I saw Mr. Potter that Monday morning, and I told Mr. Potter about this particular incident; that everything wasn't done according to the way I wanted it; that Mr. Benatar did not stop payment on his check, and that is how they caught this particular error, and he advised me to get an attorney. So I talked it over with my wife and

she said I might as well plead guilty because when I got the attorney they had all the facts in evidence."

Furtado signed a full confession for the Collector's office. Four days later, on Monday morning, September 24, 1951, he tried to commit suicide.

4.  *Benatar Had Direct And Complete Control Of The Corporation*

Another example of appellants' microscopic criticism of the appellee's interpretation of the evidence in this case is found in the appellants' objection to the appellee's summary of Benatar's extra-judicial statement, supra, relative to Potter's powers. In that summary, the following appears:

"He (Potter) does not have independent authority to decide matters but refers all matters to me for approval. While I would not object or reprimand him should he cash large checks without my prior approval, he obtained my permission prior to the cashing of such checks."

The appellants purport to correct this alleged "misstatement of fact and illogical conclusion" by quoting directly from the record, as follows:

"*The Record.* Benatar's statement, page 5, is as follows:

"Q. Does he have independent authority to decide matters, or does he refer all matters to you for your approval? A. He refers matters to me for approval, sir.

"Q. And does he have authority to O.K. checks for cashing? A. Well, sir—

"Q. I mean large checks, not a five or ten dollar check. A. He would have, if he wanted to do it. I wouldn't frankly, object or reprimand him for it; but I do believe he asks me, if they are large checks; he would ask me.

"Q. He would refer them to you? A. He would refer the question to me before he cashed them."

It is difficult to perceive any substantial difference between these two

versions. Whichever statement is accepted, it discloses that Benatar was the guiding spirit of the corporation which bore his name and, which, as the appellants admit, "was almost wholly owned" by him. Benatars was substantially, though not technically, a corporation sole.

### 5. *The Specification Of Errors*

The specification complains of seven errors, as follows:

1. The District Court erred in denying Benatar's motion for a judgment of acquittal, made at the conclusion of all the evidence. "The evidence was insufficient to establish the charge."

2. Same as to Benatars.

3. The District Court erred in instructing the jury as follows:

"Where the existence of a criminal conspiracy has been shown, every act or declaration of each member of such conspiracy, done or made thereafter pursuant to the concerted plan and in furtherance of the common object, is considered the act and declaration of all of the conspirators and is evidence against each of them. On the other hand, after a conspiracy has come to an end, either by the accomplishment of the common design, or by the parties abandoning the same, evidence of acts or declarations thereafter made by any of the conspirators can be considered only as against the person doing such acts or making such statements.

"In this regard I call your attention to one piece of evidence that has been admitted here which is limited entirely to the defendant Benatar, and that is the statement which is in evidence. Now, under any consideration of the evidence that statement was made after the conspiracy had terminated, and I have, at the time it was admitted, I specifically limited it to the defendant Benatar, and that is precisely what the language I have just read to you means. It means that state-

ments such as that made after the conspiracy, statements made after the conspiracy is ended or declarations made after the conspiracy is ended can be considered against only the person making them and not other members of the conspiracy."

4. The District Court erred in refusing to give appellants' requested Instruction No. 12, which reads as follows:

"In determining whether or not a conspiracy existed as charged in the indictment and that the defendant Morris Benatar was a member of such conspiracy, you are instructed that you cannot take into consideration and must disregard and put out of your mind any and all testimony and evidence relating to any acts done or declarations made by any other alleged co-conspirator out of the presence of the defendant Morris Benatar and which acts or declarations were not authorized by Morris Benatar. In other words, so far as the defendant Morris Benatar is concerned, the existence of the conspiracy charged in the indictment and his connection therewith as a member must be established by evidence independent of the acts and declarations of any other alleged co-conspirator done or made out of the presence of Morris Benatar and which were not authorized by the said Morris Benatar."

5. The District Court erred in admitting in evidence over appellants' objections, and refusing to strike out the testimony of Furtado relative to the juggling of the Calo Dog Food accounts and changing his records in the Internal Revenue Office to show that the sum paid by the Calo Company for the quarter ending December 31, 1950, had in fact been paid by Benatars. (The testimony of Furtado is summarized in an appendix to the appellant's brief, which appendix is referred to in the specification of errors.)

6. The District Court erred in admitting in evidence over appellants' objections and refusing to strike out Government's Exhibit 10, and the testimony of Furtado and Mooney (sic) relative thereto.

(This specification is quite lengthy, occupying four pages of the appellants' brief. It relates to the claim for abatement filed on behalf of Benatars, dated November 22, 1948, hereinabove fully discussed.)

7. The District Court erred in admitting over appellants' objections and refusing to strike out the testimony of George C. Deckard and Government's Exhibit No. 49.

Deckard, called by the Government, testified in substance that he was assistant secretary and office manager of the Calo Dog Food Co., Inc.; that the company filed a return for withholding and social security taxes for the quarter ending December, 1950, on January 30, 1951, together with the payment thereof; that the total for said quarter was $14,334.17.

The Government then offered in evidence the Calo Company's check, and two Federal Reserve Depositary Receipts totaling $14,334.17. The same were admitted as Government's Ex. 49, over the objections of appellants that the matters attempted to be proved did not fall within the purview of any conspiracy charge made in the indictment. At the conclusion of all the evidence appellants moved to strike out the testimony of Deckard and also Ex. 49 on the grounds that they were incompetent, immaterial, not within any of the issues of the indictment, and that the Calo transaction in its entirety was not part of the conspiracy charge.

(The evidence in this Calo-account episode has already been fully discussed).

6. *There Was Substantial Evidence To Support The Charges Against Both Benatar And Benatars*

■ The evidence tying Benatar to the conspiracy already has been amply summarized. It was clearly sufficient to support the verdict and judgment.

As far as the corporation was concerned, we have already pointed out that, substantially though not technically, it was Benatar's *alter ego*. Being a legal and not a human entity, it could act only through a human agent. Benatar was not only the corporation's agent, but its master.

But whichever was the master and whichever was the servant, together they plotted with Furtado to cheat the United States Government of its taxes. Both are equally guilty, though not equally punishable, in contemplation of law. See Pankratz Lumber Co. v. United States, 9 Cir., 1931, 50 F.2d 174.

There is no merit to Specified Errors Nos. 1 and 2.

7. *The Instruction Relative To Benatar's Extrajudicial Statement Did Not Say To The Jury That The Conspiracy Charged In The Indictment Had Been Established*

■ With regard to the third specified error, the appellants contend that "The instruction unequivocally states to the jury that the Court admitted the extrajudicial statement given by Benatar to the Internal Revenue officers *because the conspiracy charged in the indictment had been established*". (The emphasis is the appellants'.)

After this instruction had been given, counsel complained that the Court had said therein that Benatar's statement was admitted solely as against Benatar since it was made "after the conspiracy". From this counsel argues that "By the foregoing instruction the Court told the jury that so far as the appellant Benatar was concerned the conspiracy had been established and that Benatar was a part and parcel thereof".

In other words, the objection is that there are certain sentences in the second paragraph of the instruction which indicate that the existence of the conspiracy could be assumed to be established.

While such a construction might be plausible if one considered only certain isolated sentences in the second paragraph, if the instruction is considered *as a whole* no such inference is tenable.

■ And it is the law that an instruction *must* be construed as a whole. A trial judge cannot be expected to cram all the limitations, qualifications, exceptions, and distinctions of a legal principle into one sentence or even into one paragraph. Judicial pronouncements, like every other type of human discourse, must be allowed some *elbow room*. Isolated excerpts are not to be considered apart from their context, and, so considered, are not to be tortured into constituting error.

No intelligent juror would have construed the instruction in question as telling him that the existence of the conspiracy was to be taken as established.

The norm that should be applied to instructions has been repeatedly indicated by this Court. In Barcott v. United States, 9 Cir., 1948, 169 F.2d 929, 932, certiorari denied, 1949, 336 U.S. 912–913, 69 S.Ct. 602, 93 L.Ed. 1076, Judge Orr said:

"Complaint is made of certain instructions requested by appellant and refused, and of certain instructions given by the Court. The alleged errors are said to be found in the language employed in certain instructions and of language omitted in other instructions.

"Detached paragraphs, sentences and phrases are emphasized and singled out. We have examined the charge given by the Court as a whole and find that it fully and fairly presents the law of the case."[1]

Considered as a whole, the instruction attacked as Error No. 3 does not constitute ground for reversal.

**8. *The Appellants Are Not In A Position To Complain Of The Court's Refusal To Give The Requested Instruction Relative To Extrajudicial Statements Of Any Alleged Co-Conspirator Tying Benatar To The Conspiracy***

■ At the close of the District Judge's charge, counsel for the appellants made the following statement:

"Now, I would like to note an exception (objection) on behalf of each of the defendants for (sic) the failure of the Court to give defendants' Instruction No. 13—No. 12 first, which is to the effect that the guilt of Morris Benatar could not be established—that the existence of the conspiracy charged so far as Morris Benatar was concerned and his connection therewith could not be established by the acts and declarations of any other alleged co-conspirator in the case."

We are precluded by Rule 30 of the Federal Rules of Criminal Procedure, 18 U.S.C.A. from reaching the merits of the appellants' objection, embodied in Specified Error No. 4. That Rule reads in part as follows:

"* * * No party may assign as error any portion of the charge *or omission therefrom* unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects *and the grounds of his objection.* * * *"* (Emphasis supplied.)

In his abortive objection quoted above, counsel for the appellants merely restated his request, but did not even attempt to give the *grounds* for his complaint that the Court below had failed to give the instruction that he had requested. He should have pointed out, if he could, that there was evidence in the record consisting of statements by Ben-

1. See also McCoy v. United States, 9 Cir., 1948, 169 F.2d 776, 785, certiorari denied, 1948, 335 U.S. 898, 69 S.Ct. 298, 93 L.Ed. 433; Himmelfarb v. United States, 9 Cir., 1949, 175 F.2d 924, 951, certiorari denied, 1949, 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527; Remmer v. United States, 9 Cir., 1953, 205 F.2d 277, 290–291.

atar's alleged co-conspirators to the effect that Benatar was a member of the conspiracy, which statements were being relied upon by the appellee to *establish* Benatar's connection with the conspiracy. In other words, he should have shown that the requested instruction was *relevant*, in the light of the evidence adduced in the present case. Refusal of a requested instruction on an abstract proposition of law, which could not aid the jury, is not error. Clark v. U. S., 5 Cir., 1923, 293 F. 301, 304.

Neither in his objection before the District Judge, supra, nor in his briefs on this point, nor in his oral argument did counsel for the appellant Benatar point to a single statement by any of the co-conspirators implicating Benatar, except, of course, the statements made in Court under oath which were clearly admissible as against Benatar. In other words, none of the co-conspirators were quoted as having made *extrajudicial* statements connecting Benatar with the conspiracy.

Benatar's connection with the conspiracy was established, on the contrary, by his signing of the various tax returns, by his letter of August 28, 1951, supra, and by his damaging statement to Furtado, with reference to the scheme for a fraudulent refund of $14,335.29: " 'If you get that, I will give you half of it.' I didn't say anything. He said, 'I will give you two-thirds of it.' " Furtado quoted this language of Benatar's in open court.

The error complained of, if error it were, necessarily should have been connected to the testimony, and the relevancy of the requested instruction should have been pointed out to the court below. No "fundamental" or "stock" conspiracy instruction was here involved.

■ It is true that a "fundamental" instruction should be given by the Court, regardless of a proper request or objection. But an instruction *that needs to be related to the facts at bar in order to be proper,* is not a "funda-

mental" one. In the latter case, the following language in Screws v. United States, 1945, 325 U.S. 91, 107, 65 S.Ct. 1031, 1038, 89 L.Ed. 1495, is apposite:

"It is true that no exception was taken to the trial court's charge. Normally we would under those circumstances not take note of the error. (Case cited.)"

It is precisely to such special instructions, related to the particular facts of a given case, that Rule 30 of the Federal Rules of Criminal Procedure applies. If every failure to give such instructions is to constitute "plain error", so as not to require a proper request or objection, we might as well jettison Rule 30 altogether.

■ Nor should the application of the Rule be reserved for trivial and immaterial matters, where the error complained of would not be reversible anyway.

This Rule tends to discourage an advocate from making cryptic objections to the Court's instructions, and then, if the verdict goes against him, relying upon the alleged error as a deprivation of his Constitutional rights. The Rules generally are designed to prevent counsel from holding his cards close to his vest.

Rule 30 should not be whittled down to suit the individual inclinations of particular judges in particular cases. It has a salutary purpose, and should be honored more in the observance than in the breach.

■ Furthermore, were it to be held that the failure to give the requested instruction 12 was error, from a reading of the whole record it affirmatively appears that such failure was not prejudicial. Bihn v. United States, 328 U.S. 633, 66 S.Ct. 1172, 90 L.Ed. 1485.

We conclude "with fair assurance after pondering all that happened" that the judgment in this case would not have been different had the refused instruction been given. Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557.

Finally, Specified Error No. 4 does not conform to Rule 18(2) (d) of this Court, which requires that "the specification shall set out * * * the grounds of the objections urged at the trial". Here the appellants merely state: "To the refusal to give the foregoing instruction the appellant Morris Benatar duly objected and excepted. (Instructions, pp. 38–9)."

The especial necessity for compliance with Rule 30 of the Rules of Criminal Procedure and with Rule 18(2)(d) of this Court in attacking on appeal the giving or the refusal of an instruction "specially related to the facts at bar", has been fully discussed very recently by this Court in Kobey v. United States, 9 Cir., 208 F.2d 583.

9. *The District Court Did Not Err In Admitting Evidence Relating To The Juggling Of The Calo Dog Food Account*

As we have seen, Specified Errors Nos. 5 and 7 deal with the admission in evidence of the testimony of Furtado and Deckard in connection with the appellants' machinations regarding the account of the Calo Dog Food Co., Inc., as well as the admission in evidence of Government's Exhibit No. 49 with reference to the same account.

We have already fully reviewed the sordid story of this manipulated account and Benatar's promise to Furtado if the latter could carry out this fraud to a successful conclusion.

Whether we regard Furtado's plan as one "to actually steal from the Government the sum of $14,335.19, (sic) an objective entirely different from anything charged in the indictment as the conspiracy", as claimed by the appellants; or whether we agree with the appellee "that the payment of the tax penalty and interest for this quarter (ending December 31, 1950) was so inseparably interwoven with the Calo Dog Food Company and the offenses charged in the conspiracy that the account could not be unscrambled"—the fact remains that this Calo transaction was at least admissible as a similar act to show intent.

Under the present record, however, it is not necessary to rely upon this Calo Dog Food swindle attempted by Furtado with Benatar's blessing, as being merely a similar act. Furtado definitely testified that he told Benatar and Potter that if he had a letter from them stating that the original check had been misplaced in the Collector's office, he could juggle the books so that the penalty and interest could either be refunded to them or credited to another account. This spurious refund claim was part and parcel of the fraud hatched around the Calo account.

The above conversation occurred on or about August 1, 1951. It will be remembered that the conspiracy commenced on or about November 1, 1948, and continued until April 15, 1952, according to the indictment; and that the object of the conspiracy was to be accomplished, in part, by Furtado's "acceptance * * of said payment of taxes so due upon the said withholding and employment tax returns without the payment or addition of accrued penalties and interest," etc.

Accordingly, both as to dates and as to subject-matter, the Calo transaction came within the ambit of the indictment.

Specified Errors Nos. 5 and 7 are without merit.

10. *There Was Substantive Evidence to Connect Benatar With The Abatement Claim Fraud*

We have already reviewed the evidence in connection with the conspiracy involving Benatar, Potter, and Furtado relative to the backdated request for an extension of time, which request was used as the basis for the claim for abatement that Benatar signed. Specified Error No. 6 relates to this backdated request.

Inadvertently no doubt, the appellants assert that "This entire transaction was most prejudicial to the appellant Benatar". We agree. In quite another

sense, such a "transaction" would be "most prejudicial" to the appellee, since it would cause the latter improperly to abate a tax.

There was substantial evidence to involve both appellants in this part of the general conspiracy to pay "taxes so due upon the said withholding and employment tax returns without the payment or addition of accrued penalties and interest," etc.

### 11. *Conclusion*

There was no reversible error committed by the Court below in its rulings, and there was substantial evidence to support the verdict and the judgments.

Accordingly, the judgment as to each appellant is affirmed.

DENMAN, Chief Judge (dissenting).

I dissent from the affirming of the judgment against Benatar. The court justifies the refusal to give the most important instruction 12 by reliance on a technical failure in the form of the objection to it to comply with Rule 30, Federal Rules of Criminal Procedure. The court completely ignores Rule 52(b) concerning plain error, though vigorously pressed in this dissent.[1] Rule 52(b) provides:

"Plain Error. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."[2]

Here, apart from the criticized objection[3] pointing out the need for the instruction,[4] it protrudes like the sore thumb of conventional speech. It consists of evidence, inadmissible as to Benatar, of *over 100 pages of the record,* required to be summarized in over 7 pages of the opinion, of *hearsay statements of other co-conspirators concerning Benatar's participancy in the conspiracy.* This is in clear violation of Glasser v. United States, 315 U.S. 60, 74, 62 S.Ct. 457, 86 L.Ed. 680; and many other cases.[5]

There could not be a clearer case in which the plain error Rule 52(b) out-

---

1. The practice in the Ninth Circuit is to await the distribution and consideration of a dissent before filing a majority opinion.

2. There is nothing novel in the rule, the revisers stating that it is based upon Wiborg v. United States, 163 U.S. 632, 658, 16 S.Ct. 1127, 1137, 41 L.Ed. 289. There, in reversing, the Supreme Court invoked it, where the "question was not properly raised".

3. "Now, I would like to note an exception on behalf of each of the defendants for the failure of the Court to give defendants' Instruction No. 13—No. 12 first, which is to the effect that the guilt of Morris Benatar could not be established —that the existence of the conspiracy charged so far as Morris Benatar was concerned and his connection therewith could not be established by the act and declarations of any other alleged co-conspirator in the case."

4. The applicability and form of instruction 12 to disregard such evidence is not questioned by the court, nor read as a whole, could it be. It is:

"In determining whether or not a conspiracy existed as charged in the indictment and that the defendant Morris Ben-

atar was a member of such conspiracy, you are instructed that you cannot take into consideration and must disregard and put out of your mind any and all testimony and evidence relating to any acts done or declarations made by any other alleged co-conspirator out of the presence of the defendant Morris Benatar and which acts or declarations were not authorized by Morris Benatar. In other words, so far as the defendant Morris Benatar is concerned, the existence of the conspiracy charged in the indictment and his connection therewith as a member must be established by evidence independent of the acts and declarations of any other alleged co-conspirator done or made out of the presence of Morris Benatar and which were not authorized by the said Morris Benatar." (Emphasis supplied.)

5. It was early so held in this circuit in reversing the conspiracy cases of Dolan v. United States, 123 F. 52, 54 and Kuhn v. United States, 9 Cir., 26 F.2d 463, 464. So also in the Tenth Circuit, in reversing in the conspiracy cases of Minner v. United States, 57 F.2d 506, 511 and Thomas v. United States, 57 F.2d 1039, 1042.

weighs Rule 30. The principal witness and, indeed, the necessary witness to convict Benatar was the informer Furtado. To the jury it was Furtado versus Benatar. Here the evidence of the felon Furtado, serving a ten-year sentence, with the jury's knowledge that in aiding the prosecution he might hope to shorten his imprisonment by an early parole or by a pardon, is weighed by the jury against that of Benatar with his presumption of innocence. This is a situation in which a normal juror would scrutinize the veracity of the felon's testimony against that of Benatar with the gravest care. However, in this situation the jury considered Furtado's testimony so wrongfully weighted with the over 100 pages of his description of Potter's acts and statements in Benatar's absence showing the existence of the conspiracy.

Without mentioning either the jury's weighing of the comparative veracity of these two witnesses or the effect of these 100 pages of adverse testimony so wrongfully before them to determine whether Benatar was a party to the conspiracy, this court states that "We conclude 'with fair assurance after pondering all that happened' that the judgment in this case would not have been different had the refused instruction been given. Kotteakos v. United States, 328 U.S. 750 [765], 66 S.Ct. 1239, 1248, 90 L.Ed. 1557."

Significantly the court omits the following phrase from its "pondering." It is "without stripping the erroneous action [100 pages] from the whole." In so ignoring the character of Furtado and his wrongfully considered mass of evidence, I cannot agree with the court. Unless "stripping" from the whole record Furtado's felonious character and the 100 pages could I say in compliance with the Kotteakos case that it is possible "to conclude that [Benatar's] substantial rights were not affected".

Only by assuming the function of a jury's appraisal, can one say the mass of wrongful testimony would not affect the decision. Yet we are forbidden to do this not only in the Kotteakos case but also in Bollenbach v. United States, 326 U.S. 607, at page 615, 66 S.Ct. 402, 406, 90 L.Ed. 350, where the court states:

"* * * In view of the place of importance that trial by jury has in our Bill of Rights, it is not to be supposed that Congress, *intended to substitute the belief of appellate judges in the guilt of an accused*, however justifiably engendered by the dead record, for ascertainment of guilt by a jury under appropriate judicial guidance, however cumbersome that process may be." (Emphasis supplied.)

Following in the same term in Bihn v. United States, 328 U.S. 633, at page 638, 66 S.Ct. 1172, at page 1174, 90 L.Ed. 1485, a conspiracy case, in reversing the court because it did not affirmatively appear from the whole record that the wrong done was prejudicial, the Court stated:

"* * * as stated in McCandless v. United States, 298 U.S. 342, 347, 348, 56 S.Ct. 764, 766, 80 L.Ed. 1205, 'an erroneous ruling which relates to the substantial rights of a party is ground for reversal unless it *affirmatively* appears from the whole record that it was not prejudicial.'" (Emphasis supplied.)

Not only does the court's assuming of the function of the jury so violate these Supreme Court decisions but it overrules *sub silentio* a long line of cases of the Ninth Circuit. In the instant case the district judge ignored all the requested instructions of both parties.[6] The *en banc* case of Samuel v. United States, 9 Cir., 169 F.2d 787 in which Judge Orr joined, holds in reversing, in accord with Rule 52(b), that the court in a criminal case must instruct on all the essential questions of law involved, whether or not requested. Its language,

---

6. Cf. Opinion Judge Groner in reversing for failure to give an instruction in this situation. Colbert v. United States, 79 U.S.App.D.C. 261, 146 F.2d 10, 13.

169 F.2d at page 792, is: "In a criminal case the court must instruct on all essential questions of law involved, *whether or not it is requested to do so.* Kreiner v. United States, 2 Cir., 11 F.2d 722; Kinard v. United States, 68 App. D.C. 250, 96 F.2d 522; Morris v. United States, 9 Cir., 156 F.2d 525 [169 A.L.R. 305]; United States v. Levy, 3 Cir., 153 F.2d 995; Corson v. United States, 9 Cir., 147 F.2d 437; Miller v. United States, 10 Cir., 120 F.2d 968; Screws v. United States, 325 U.S. 91, 107, 65 S.Ct. 1031, 89 L.Ed. 1495, 162 A.L.R. 1330; United States v. Noble, 3 Cir., 155 F.2d 315; United States v. Pincourt, 3 Cir., 159 F.2d 917; see 169 A.L.R. 305–355 on the subject generally. We think giving the wrong law in this case was certainly not less prejudicial than omission to give the law at all." (Emphasis supplied.)

The judgment should be reversed and a new trial ordered.