MITCHELL et ux.

v.

UNITED STATES.

No. 13884.

United States Court of Appeals Ninth Circuit.

June 7, 1954.

Rehearing Denied Aug. 6, 1954.

Kent & Brookes, Valentine Brookes, Arthur H. Kent, Paul E. Anderson, San Francisco, Cal., for appellants.

Lloyd H. Burke, U. S. Atty., San Francisco, Cal., John Lockley, Asst. U. S. Atty., Washington, D. C., Macklin Fleming, Sp. Asst. to U. S. Atty., San Francisco, Cal., for appellee.

Before HEALY, ORR, and LEMMON, Circuit Judges.

LEMMON, Circuit Judge.

It is familiar technique for an appellant to seize upon every peccadillo committed by the lower court and magnify it until it becomes a blunder of major proportions.

The present case is no exception.

Although nine errors have been specified in this appeal, only three need be discussed.

The most serious objection is that the trial judge did not allow appellants' counsel to cross-examine one of "the prosecution's key witnesses".

The appellee replies that, on the contrary, there was full cross-examination by the defense. It is pointed out that the witness in question was friendly to the appellants, and that the lower court limited the appellants' use of leading questions addressed to her.

Properly to evaluate this asserted error, it must be considered in its factual setting.

1. *Statement Of The Case.*

The indictment was based upon 18 U.S.C.A. § 371 and 26 U.S.C.A. § 145(b). The appellant Vaughn H. Mitchell was convicted on three counts. Counts 1 and 2 charged him with attempting to defeat and evade a large part of an income tax due by him and his wife, Dorothy Mitchell. Count 5 charged that he and his wife conspired to evade and defeat a part of their income tax. Counts 3 and 4 charged Dorothy Mitchell with attempting to defeat and evade a large part of her income tax, and Count 5 charged her with conspiracy, as above stated. She likewise was convicted on the three counts in which she was accused. All five counts of the indictment related to the income tax for the calendar year 1947. In round figures, it was alleged that $26,000 of net income was concealed and $18,000 of tax was evaded. The indictment was filed on August 21, 1952.

Named in the indictment as a conspirator but not as a defendant was Iris M. Cowart, whose testimony, which will be fully discussed hereinafter, played an important part in the case. On August 11, 1950, she was notified by the Bureau of Internal Revenue at San Francisco that "This office has under consideration a recommendation involving the institution of criminal proceedings against you."

2. *The Evidence.*

Only so much of the evidence will be summarized as will indicate the importance of the testimony as to which it is complained that full cross-examination was not permitted.

Dr. Vaughn H. Mitchell, one of the appellants herein, is a practicing physician and surgeon in San Francisco. Mrs. Cowart was his employee from 1943 to 1948. During the crucial year of 1947, she "took care of the Kardexes, * * the billing and the banking," handling the money and making deposits, and "keeping the accounts". She said that she was "not a bookkeeper".

Mrs. Cowart testified that in 1947, probably in January, she had a conversation with Mrs. Mitchell "with respect to keeping two records of the books or giving her some money * * *. She was to get the morning receipts, and I also confirmed it with Dr. Mitchell. * * * I asked him if it was correct that I was to give Dorothy some money from the office, and he said that was correct and to keep a record of it."

Mrs. Cowart added that she and Mrs. Mitchell "discussed keeping the morning receipts as she (Mrs. Mitchell) was to have them, and then to keep a record of it in a receipt book and to put my initials on the book of the money" that she gave Mrs. Mitchell. The witness' best recollection was that Dr. Mitchell told her to keep the morning receipts in one set of books, and to change in the middle of the day, although she was not sure whether she got "that impression from the conversation with Dorothy Mitchell".

At any rate, Mrs. Cowart recalled Dr. Mitchell's saying that "he wasn't putting all the money in one account in the bank, that Dorothy Mitchell was to have some of the money".

The witness said that she kept "two receipt books", "one for the morning receipts and one for the afternoon receipts." At about 1 o'clock in the afternoon, she "switched receipt books", "from the morning book to the afternoon book". "The money from the morning book was given to Mrs. Mitchell, and the afternoon book was deposited as it always had been." Mrs. Mitchell would come to the office once a month or once every six weeks to pick up the money.

Mrs. Cowart continued to hand money to Mrs. Mitchell throughout the year 1947, during which time the witness delivered "not over $15,000" to the doctor's wife.

This unique system of "double entry bookkeeping" ended in December, 1947. In the latter part of January or February, Mrs. Cowart took the six or seven "morning receipt books" to Mrs. Mitchell at the latter's apartment. Mrs. Cowart had planned to leave Dr. Mitchell's employ at the end of December, 1947, but there was difficulty in getting a girl to replace her, and she actually quit at the end of February, 1948.

The appellee not only concedes that Mrs. Cowart was an important witness against Dr. Mitchell, but it emphasizes the damaging nature of her testimony. In its brief, the appellee says:

"At the trial the testimony of Mrs. Cowart established Dr. Mitchell's participation in every important phase of the scheme—its initiation * * *, suspension during Mrs. Cowart's vacation * * *, termination at the end of the year * * *, and delivery of the hidden set of cash receipt books to Mrs. Mitchell * * *."

3. *The Trial Judge Did Not Unduly Restrict Defense Counsel's Cross-Examination of Mrs. Cowart.*

In the official transcript of record before us, defense counsel's entire questioning of Mrs. Cowart is labeled "Cross-Examination". This, of course, is not conclusive that the Court permitted an adequate cross-examination of the witness. To determine this question, a careful analysis of the queries propounded to her is necessary, as well as some examination of the factual background.

Mrs. Cowart had testified before the grand jury that had brought in the present indictment, and at the trial was called as an adverse witness by the appellee. Dr. Mitchell was her physician, and she was a close personal friend of Mrs. Mitchell, whom she had known for fifteen years. Mrs. Mitchell herself testified regarding the relationship between the two women: "We are exceptionally good friends". It will be observed that Mrs. Mitchell here used the present tense, and was not referring merely to the feeling that existed between the two women before the income tax troubles arose.

Defense counsel examined Mrs. Cowart at great length. After the questioning had proceeded for several minutes—represented by ten pages of the printed transcript—Mrs. Cowart was excused from the stand when a message was received by the Court that her husband was in a dying condition at a local hospital.

Eight days later, the examination was resumed, continuing for 12 more transcript pages before it was interrupted by counsel for the appellee. It should be noted that from the very beginning of his questioning of the witness, up to the time of the interruption, the defense attorney himself had repeatedly referred to his queries as "cross-examination".

The interruption came when the defense attorney started to question Mrs. Cowart as to how money was being deposited (presumably by Dr. Mitchell) in 1947. The transcript shows that the following colloquy occurred:

"Q. Do you remember whether Appling (Special Agent) or Green (Internal Revenue Agent), either singly or together, any way, around the first of April of 1947 asked you anything about how money was being deposited in 1947, all the money was being deposited? A. No, I don't remember that.

"Q. To the best of your recollection was any such conversation ever had with you by either Green or Appling? A. No.

"Q. As a matter of fact, at that time, Mr. Green (sic), in the spring of 1947, they were concerned with and investigating 1947 and 1946, isn't that right?

"Mr. Fleming (counsel for the appellee). Well, I object to this.

"Mr. Dana (counsel for the appellants). I am asking if she knows.

"Mr. Fleming. Mr. Dana is testifying, not even asking the questions.

"Mr. Dana: This witness is for the purpose of cross-examination.

"Mr. Fleming. This is an adverse witness, and I will object to this as a leading question. Leading questions are normally permissible under cross-examination. However, that rule is subject to an exception where the witness proves to be in favor of the party who is the cross-examiner, and the danger of leading questions—

"The Court: Sustained.

"Mr. Dana: Let me clarify it, so I won't abridge your Honor's ruling, trespass on your Honor's ruling:

"This lady is put into the case as an alleged conspirator by the Government, called by them, and a lot of hearsay testimony admissible under that rule of conspiracy has been introduced. I don't believe I am limited to the rule of a person asking questions as a direct examiner, they bringing her here, I didn't.

"The Court. They brought her here in the capacity of an adverse witness and so announced to the Court.

"Mr. Dana. They call her a conspirator. Am I not allowed to cross-examine her? I will abide by the Court's ruling, but it seems to me I shouldn't be placed in that position.

"The Court. *You will ask direct questions.*

"Mr. Fleming. Mr. Dana can call the witness himself as his own witness and question fully in regard to these things.

"Mr. Dana: I will determine the defense, subject to the Court's ruling.

"The Court: *I have already ruled. You shall ask direct questions.*

"Mr. Dana. And treat this witness as practically—I mean, I may not cross-examine?

"The Court. That is correct.

"Mr. Dana. Very well, your Honor, I will abide by that."

Nevertheless, defense counsel did not give up trying. Fourteen times he asked Mrs. Cowart questions to which the attorney for the appellee objected as leading. Each time the Court sustained the objection.

Nor did the Court's sustaining of the objections defeat defense counsel in his attempts to ask questions that he believed might elicit the information he desired. The very first of the fourteen questions referred to above is typical. Referring to the plan to keep separate receipt books, already outlined, counsel asked:

"Q. Do you remember the substance or can you remember with any particularity your conversation with Dr. Vaughn Mitchell concerning this? A. Well, I believe I asked him if it was right that Dorothy was to have some money from the office, the morning receipts, and kept in a separate—and give her receipt book or something to that effect. I can't remember any exact conversation that I had, how it was worded.

"Q. Was the word 'receipt book' or the word a 'separate'—

"Mr. Fleming: The question is leading, if the Court please.

"The Court. Sustained."

Thereupon, counsel reframed the question as follows:

"Q. (By Mr. Dana): Can you tell us whether or not the word 'receipt book' was used or the word (sic) 'a separate account of it'?"

To this question, no objection was made, and the witness gave her answer.

■ It is well settled that the extent of cross-examination and the restriction of the use of leading questions rest in the sound discretion of the trial court. St. Clair v. United States, 1894, 154 U.S. 134, 150, 14 S.Ct. 1002, 38 L.Ed. 936; Alford v. United States, 1931, 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624; Glasser v. United States, 1942, 315 U.S. 60, 83, 62 S.Ct. 457, 86 L.Ed. 680.

The object of examination is to get the facts. Whether direct or cross questions best serve that end depends upon circumstances. The trial judge is in a better position than is this Court to determine the precise point at which the asking of leading questions should be brought to a halt. He sees the witness and hears the testimony, and thus has a better opportunity to assess the true situation existing at any given posture of the case, than can we from the cold record. The discretion of an experienced trial judge in this, as in other respects, should not be lightly disregarded.

■ We find that the trial court did not abuse its discretion in limiting the cross-examination of Mrs. Cowart.

4. *Testimony Relating To Dr. Mitchell's Income Taxes For 1942–1946 Concededly Was Admissible, And The Appellants Are Not In Position To Complain Of The Instructions Thereon.*

On February 16, 1949, Dr. Mitchell was indicted on five counts on the charge that he "did wilfully and knowingly attempt to defeat and evade" his income tax for the years 1942–1946, inclusive. A sixth count charged that he "attempted to defeat and evade" Mrs. Mitchell's income tax for 1946. All six counts were based on 26 U.S.C.A. § 145(b). Dr. Mitchell was acquitted on all counts.

Much evidence was introduced by the appellee concerning the investigation for 1942–1946. The appellants "have * * * not challenged the admissibility of the evidence, but merely the failure of the trial judge to instruct the jury properly about the inferences that could be drawn from it".

The relevancy of this evidence is clear. The record shows that on November 5, 1946, Agent Green had the following conversation with Dr. Mitchell:

"A. I told the doctor that I had just finished adding up the bank deposits for the years 1942 through 1945 and had compared them with the gross receipts as reflected on his tax returns for those years and had found a large discrepancy.

"Q. What did he say to that? A. He asked me if I had any idea of what the figure was, and I told him I could only give him a very preliminary estimate and the figure I quoted to him was $100,000.

"Q. And how did you tell him you had arrived at that figure? A. I told him I had arrived at it by totalling the bank deposits.

*          *          *          *          *          *

"He asked—I don't remember whether it was just at that very moment or a little while later if he asked that—that he asked whether he should have an accountant.

*          *          *          *          *          *

"I told him that since the girls had mentioned and had told me that all money that was taken in by the profession was deposited and that all expenses of his practice were paid by check, that an accountant would not be necessary *because they get the figures right from the bank account and right from the checking account and that if there was any problem that they ran into I was available for him as we are in all cases.*

"Q. Did you say what figures could be used for gross income? A. I told him that the bank deposits,

since I had been informed all money was put in that account or accounts, would be the basis of his gross receipts."

As has already been stated, there is evidence that the appellants, in January, 1947, evolved the scheme relating to the double sets of cash receipt books. Since that plan was hatched a month or two after the above conversation with Agent Green, it is the appellee's theory that the appellants' ingenious double-book plot was unwittingly suggested to them by Agent Green. In other words, under the new scheme, the bank deposits would *no longer* reflect the Doctor's gross income.

■ The above-quoted testimony of Green supports that theory and was properly admitted.

The appellants, however, specify as error the trial court's failure to instruct the jury that Dr. Mitchell's acquittal on similar charges for the years 1942–1946 "conclusively established that no wilful attempt to evade taxes had been made in those years".

The court charged as follows:

"You are instructed that the guilt or innocence of Dr. Vaughn H. Mitchell on charges of tax evasion for the years 1942 to 1946, inclusive, is not to be considered by you in determining his guilt or innocence on the charges which are now before you, nor are you to consider for any purpose whatsoever the result of any previous trial."

The appellants do not deny that they failed to comply with Rule 30 of the Rules of Criminal Procedure, 18 U.S.C. A., in that they did not object to this instruction before the jury retired, *"stating distinctly the matter to which"* they objected and *"the grounds"* of their objection. They assert, however, that they "brought out this point sharply on their argument for a new trial". Such an ob-

jection, of course, is not a compliance with Rule 30. Neither is it a compliance with our Rule 18 (2) (d), which provides in part:

"When the error alleged is to the charge of the court, the specification shall set out the part referred to totidem verbis, whether it be in instructions given or in instructions refused, *together with the grounds of the objections urged at the trial.*" (Emphasis supplied.)

■ The instruction complained of dealt with a special fact-situation of the case at bar, and was not of a "stock" nature. It was therefore of a type that comes peculiarly within the sweep of Rule 30, as was pointed out at some length by us in the recent cases of Kobey v. United States, 9 Cir., 1953, 208 F.2d 583, 587–588, 597–598, and Benatar v. United States, 9 Cir., 1954, 209 F.2d 734, 743–745, certiorari denied 74 S.Ct. 786.[1]

■ But even if the instruction in question were to be considered on its merits, it would be found that the appellants have no substantial cause for complaint. Their own brief sets forth that the evidence "about the Doctor's understatement of income in his return (was) for the avowed purpose of establishing a pattern of wilful conduct which persisted into the year in question." The instruction thus frustrated the appellee's strategy completely, for the trial court bluntly and unqualifiedly told the jurors that they were not to consider the question of guilt or innocence under the 1942–1946 charges against Dr. Mitchell *"in determining his guilt or innocence on the charges which are now before you"*.

■ Finally, a study of the record convinces us that the jury could have had no doubt of Dr. Mitchell's acquittal on the earlier charges.

5. *Evidence Of Deficiencies In Income Taxes For The Years 1938–1941*

1. See also Boyd v. United States, 1926, 271 U.S. 104, 108, 46 S.Ct. 442, 70 L.Ed. 857, and Ziegler v. United States, 9 Cir., 1949, 174 F.2d 439, 448, certiorari denied, 1949, 338 U.S. 822, 70 S.Ct. 68, 94 L.Ed. 499.

*Was Properly Admitted Against Dr. Mitchell.*

■ The appellants also complain that "The Court committed reversible error in permitting the prosecution to introduce evidence, over objection, of deficiencies" in Dr. Mitchell's income taxes for the years 1938–1941, inclusive.

As to Dr. Mitchell himself, the evidence was admissible, relating as it did to "other transactions or a course of fraudulent conduct * * * to establish fraudulent intent as an element of the crime charged." Michelson v. United States, 1948, 335 U.S. 469, 475–476, 69 S.Ct. 213, 218, 93 L.Ed. 168, note 8.[2]

■ With regard to how remote such similar acts may be in point of time, the discretion of the trial court is broad. In II Wigmore on Evidence, Third Edition, 1940, Section 316(2), Page 217, we find the doctrine thus stated:

"(2) The *length of time* over which we may range in search of evidential instances is obviously determinable by no fixed rule. The precedents illustrate various lengths of time. The discretion of the trial Court should here control."

■ As to Mrs. Mitchell, the appellants assert that "Dorothy Mitchell had no connection whatsoever with the Doctor's tax returns and tax liabilities for the years 1938–1941. She did not marry him until 1944." No objection on Mrs. Mitchell's special behalf, however, was made by the appellants to the admission of this testimony: counsel merely remarked that he didn't "believe that is material to this, to anything in this inquiry". Furthermore, the jury was in no way misled, for the questioning on this subject repeatedly specified Dr. Mitchell only: "Now, with respect to 1938, will you tell us what was the amount reported by Dr. Mitchell?", "Will you tell me how much was reported by Dr. Mitchell in 1940?", "These (figures) represent, as I understand it, the actual income that you determined in your investigation in the spring of 1947 that the Doctor made in 1938, 1939, 1940 and 1941?", etc. There was no prejudicial error here.

### 6. *Conclusion.*

■ The appellants specify a number of other asserted errors, which need not be discussed here. We have considered them all and find that they exhibit no reversible error.

This Court is convinced that each appellant received a fair trial, and that there was abundant evidence to support their conviction. Each judgment is therefore

Affirmed.

2. See also McCoy v. United States, 9 Cir., 1948, 169 F.2d 776, 783, certiorari denied, 1948, 335 U.S. 898, 69 S.Ct. 298, 93 L.Ed. 433; Himmelfarb v. United States, 9 Cir., 1949, 175 F.2d 924, 941, certiorari denied, 1949, 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527; Norwitt v. United States, 9 Cir., 1952, 195 F.2d 127, 133, certiorari denied, 1952, 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 635.